EDWARD E. GILLEN COMPANY, Appellant, vs. CITY OF
MILWAUKEE and others, Respondents.

*May 3—May 31, 1921.*

*Municipal corporations: Competitive bidding on contracts: Offi-
cers: Competency if interested in contracts: Milwaukee
sewerage commission: Rejecting bids: Discretion: Disquali-
fication of members: Extent of financial interest.*

1. Requirements in statutes that municipal contracts be let to the
   lowest bidder are important and are not to be arbitrarily dis-
   regarded; but municipal officers have no right to enter into
   contracts in behalf of the municipality in which they are in-
   terested directly or indirectly.

2. A member of the Milwaukee sewerage commission who at the
   time a contract was awarded by the commission and for some
   time prior thereto was in the employ of the successful bidder
   as a superintendent at a salary of $4,500 a year had such an
   interest in the business and welfare of such bidder as would
   tend to affect his judgment in determining on the work in-
   volved, in determining to let the work by contract, in framing
   the contract, in passing on the competency and reliability of
   bidders, and on questions relating to the performance of the
   work and the compensation to be paid.  Sec. 2, ch. 608, Laws
   1913, providing that "no commissioner . . . shall be inter-
   ested directly or indirectly in any contract entered into under
   the provisions of this act," is but declaratory of the general
   rule.

3. Under sec. 8, ch. 304, Laws 1917, authorizing the Milwaukee
   sewerage commission to reject bids and to award contracts
   to the lowest competent and reliable bidder, or relet the con-
   tract when a bidder is incompetent or unreliable, the com-
   mission was justified in deciding that the lowest bidder was
   not a competent bidder and in reletting the contract, where
   one of its members was in the bidder's employment as superin-
   tendent, even though such member resigned his position with
   the bidder and the work was relet at a higher price.  The com-
   mission may either accept the bid of the person who in their
   judgment is the lowest competent and reliable bidder or relet
   the contract.

4. A member of the sewerage commission who never had any
   financial interest in a company in which his son was interested
   and of which the son was an officer, and who ten years before
   had disposed of all his interest in the company's predecessor,
   was not disqualified to vote on the award of a contract to
   such company.

5. Nor was such commissioner disqualified to vote on the award of a contract to a corporation leasing land from a company of which he was a stockholder where it was not shown that the lessee company was insolvent or had not paid its rent promptly, or that the land would not rent to others for an equal amount, especially where the other members of the commission knew the facts.

APPEAL from a judgment of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Affirmed.*

Taxpayer's action to enjoin performance of a contract of the Milwaukee sewerage commission for public work alleged to have been made contrary to law. From judgment dismissing the complaint plaintiff appeals.

The sewerage commission of the city of *Milwaukee* is a board operating under ch. 608, Laws 1913, and acts amendatory thereof. In the winter of 1919–1920 it was planning the construction of a part of the sewage disposal plant involving the building of a cofferdam, piling, and excavation. The commission consisted of five members, among whom were *Conrad Niederman*, vice-chairman, who had been a member since its organization in 1913, and William H. Gillen, who became a member in September, 1919. In the early winter there was a vacancy on the commission which was filled on or about January 31, 1920.

*Niederman* had been a contractor for about thirty years, had been a stockholder and officer of the Starke Dredge & Dock Company, which was engaged in the contracting business. He sold certain of the stock to his older son, and the same was paid for to the satisfaction of the parties. Some ten years ago *Niederman* retired from the business, dividing his remaining stock among his two sons as a gift. He requested that the older son be elected a director of the company and it was done. Some three years later the Starke Company sold out to the *Great Lakes Dredge & Dock Company,* a company engaged in a similar business, payment being made in stock of the latter company. The older son still continues a stockholder and officer of that

company.   The other son sold his interest.   *Niederman* himself still remains a stockholder of the D. & D. Land Company, which owned and leased to the Starke Company the yard of the latter.   The yard was taken over by the *Great Lakes Company*, which holds under lease from the Land Company.   *Niederman* testified that some three years previously he had advised the sewerage commission of this fact; that George P. Miller, the chairman, knew of it.

Gillen for five or six months prior to December, 1919, had been in the employ of the *Edward E. Gillen Company* as a superintendent at a salary of $4,500 per annum.   He had been engaged on contracts with private corporations at points outside of Milwaukee, but so far as appears was subject to employment wherever the company desired his services.   He is a cousin of the president and principal owner of the *Gillen Company*, but is not himself a stockholder or officer.   He testified that when the mayor appointed him on the commission he explained his connection with the *Gillen Company* and asked if it would interfere with his serving, and that the mayor had answered he did not think so, that he would get an opinion on it from the city attorney, and that it was no connection.   On several occasions during the consideration of the work contemplated and of the bids submitted therefor members of the commission had asked Gillen if he was connected with the *Gillen Company*, or interested in it directly or indirectly, or if the *Gillen Company* was his company, and he had answered No.   He testified that they had never asked him directly if he was employed by the company as superintendent.   None of the other members knew of the relationship which he had with the company.

At a meeting of the commission on November 28, 1919, plans for the proposed work as set out in "Notice No. 51" were considered, and the trial court found that Commissioner Gillen participated therein and voted for approval thereof.

At a meeting on December 18,1919, at which three commissioners, including *Niederman* and Gillen, a bare quorum, were present, bids were received under "Notice No. 51." The two lowest bids were *Edward E. Gillen Company* $336,070 and *Great Lakes Dredge & Dock Company* $393,470. By vote of all three commissioners present the work was awarded to the *Gillen Company* upon their bid. At a meeting on January 8th from which Gillen was absent, the fact of the latter's employment by the *Gillen Company* was discovered by inquiry of the president of the company and execution of the proposed contract was delayed pending a later meeting and the securing of an opinion from the city attorney. On January 26th Gillen resigned his position with the *Gillen Company,* effective January 28th. At a meeting on January 31, 1920, four commissioners, including Gillen and *Niederman,* being present, Gillen having admitted his employment by the *Gillen Company,* the chairman of the commission refused to sign the contract which had been prepared for the work under "Notice No. 51," and by motion his action was confirmed and a readvertisement for bids · directed. The motion was adopted by the affirmative vote of Commissioners Miller and *Niederman* against one negative, Commissioner Gillen not voting. At a meeting on February 9th new bids were called for under substantially the same conditions as for contract No. 51, except that the · commission undertook to furnish certain steel sheet piling, a patented article. This change was made in order that there might be no further delay in placing an order for the same, and it was purchased by the commission at a cost of $63,747.50. These new proposals were known as "Notice No. 53." At a meeting on February 26th bids were received on "Notice No. 53," the two lowest being *Great Lakes Dredge & Dock Company* $275,930 and *Edward E. Gillen Company* $292,300, the lowest bid being thus $3,607.50 in excess of the *Gillen Company* bid on "Notice No. 51" when

the price paid for the patented article is added.   At said meeting a contract was awarded to the *Great Lakes Dredge & Dock Company* upon its bid by the affirmative votes of *Niederman* and another against the negative vote of Gillen, and thereafter a written contract pursuant thereto was duly executed and work was begun on April 26th.   The present action was commenced March 1, 1920.   To the time of the trial no funds had been paid under the contract.

The trial court found the above facts substantially as stated.   His findings with reference to the interests of Commissioners Gillen and *Niederman* are stated in the course of the opinion.   He concluded that the commission acted within its powers in reletting the contract, and that the contract with the *Great Lakes Company* was valid, and dismissed the complaint.

For the appellant there was a brief by *Van Dyke, Shaw, Muskat & Van Dyke* of Milwaukee, and oral argument by *James D. Shaw.*

For the respondent *City of Milwaukee* there was a brief by *Clifton Williams,* city attorney, and *Charles W. Babcock,* assistant city attorney, and oral argument by *Mr. Babcock.*

*Robert N. McMynn* of Milwaukee, for the respondent *Great Lakes Dredge & Dock Company.*

JONES, J.   As their first assignment of error appellant's counsel claim that the court erred in its conclusion of law to the effect that the sewerage commission, under the circumstances, had the power to relet the contract in question. Ch. 304, Laws 1917, relating to sewage disposal works in cities of the first class, which was in force at the time in question, provides as follows:

Sec. 8.   "That all work done or supplies or material purchased in carrying out the purpose of this act when involving the expenditures of one thousand dollars or more shall be by contract awarded to the lowest responsible bidder in accordance with the laws of this state and ordinances then

applicable to any such city having reference to the letting of public work by and through the board or commissioner of public works or other proper department in such city except that said commissioners shall discharge the duties imposed by such laws upon the commissioner or board of public works or other department. . . . Whenever any bidder for any work to be let by the commissioners shall be, in the judgment of said commissioners, incompetent or otherwise unreliable for the performance of the work for which he bids, the said commissioners may accept the bid of the person who in their judgment is the lowest competent and reliable bidder for said work, stating their reasons therefor, or relet the same anew."

Then follow provisions as to the terms of the contract to be made and the mode of its execution.

It is argued that requirements in statutes that contracts be let to the lowest bidder are important and are not to be arbitrarily disregarded. In this proposition we fully concur. But it is also true that officers have no right to enter into contracts in behalf of the municipality in which they are interested directly or indirectly.

The court found, and we think correctly, that William Gillen, while drawing a salary of $4,500 from the *Edward Gillen Company*, had participated in the examination and consideration of the plans of the work and had voted to approve them, and had passed upon the competency and reliability of the bidders. Under the contract contemplated, the commission, four or all members agreeing, would have the power to decide whether any part of the work should be performed by the commission itself. Here there might have been a direct conflict of interest between the company and the municipality. The contract would have provided that the commission might under some circumstances extend the time for the performance of the work, and the contract would have contained provisions for liquidated damages for delay beyond the stipulated time. As employee of the company there was nothing to prevent William Gillen from

being placed in superintendence of the work. The contract would have provided that the commission might increase or diminish the amount of work to be performed. Under the contract proposed, the chief engineer, with the consent of the commission and under its direction, would be called upon to purchase or hire appliances and secure material for the work in case of the failure of the contractor so to do. There would be many other duties to be performed by the commission, among which may be mentioned the making of payments and taking over the work in case of default by the contractor. In the execution and performance of a contract of this character involving between $300,000 and $400,000 and which might extend through a considerable period of time, it is plain that there would constantly arise conflicts of interest. The records of the courts abound in illustrations of such conflicts. As commissioner, William Gillen's duty would have been to protect the interests of the city with the utmost fidelity. As employee of the company he would have been expected to serve with the same fidelity another master. As a superintendent in the service of the company he was interested in the financial success of its contracts to the end that his service and salary might be continued and possibly that he might be promoted.

A statute which the commission was bound to obey provides: "No commissioner or person holding appointment under said commission shall be interested directly or indirectly in any contract entered into under the provisions of this act." Sec. 2, ch. 608, Laws 1913. But the statute is only declaratory of the general rule which has long prevailed forbidding members of boards and common councils from making contracts with themselves or in which they are interested.

It is true that William Gillen had no stock in the company and was not one of its officers, and in that respect he was not financially interested in the contract. The court found that

he was not pecuniarily interested in the contract directly or indirectly, but the trial judge also found that from the time of the examination of the plans and the vote for their approval up to the time of his resignation he "had such an interest in the business and welfare of the said *Edward E. Gillen Company* as would naturally tend to affect his judgment in determining upon the work involved in said official notice No. 51, in determining to let that work by contract pursuant to said notice, in framing that contract, in passing upon the competency and reliability of bidders, and upon questions relating to the performance of that work and the compensation to be paid therefor to the contractor."

We are satisfied that his finding is correct. The question then arises whether under the circumstances the commission was bound to sign and carry out a contract with the *Gillen Company*. Another part of the section of the statute already quoted is as follows:

". . . and provided, however, also that said commission with the consent of four or all its members may itself do any part or parts of any such work under such conditions in every respect as it may prescribe by day labor, whenever the chief engineer, in writing shall recommend that course; any and all bids or parts of bids for any such work or supplies or materials may be rejected by said commission." Sec. 8, ch. 304, Laws 1917.

This language was contained in sec. 8, ch. 608, Laws 1913, as well as in the amendatory act of 1917 already quoted.

It was argued by appellant's counsel that this language of the statute did not give to the commission the power, in its discretion, to reject bids for work, supplies, or material, but that under the rule laid down in the case of *Neacy v. Milwaukee,* 171 Wis. 311, 176 N. W. 871, all bids could be rejected only in the event that they were regarded in good faith as unreasonably high. An entirely different statute relating to the action of the commissioner of public works

was construed in that case, and the powers given to the sewerage commission are so different that the decision does not seem to control the present case.

It was argued by counsel for the respondents that the statutes above quoted gave to the commission wide discretion to reject bids without regard to the competency or reliability of bidders. In view of the conclusion to which we have come it seems unnecessary to decide the question thus raised. Whatever discretionary powers the commission may have had prior to the amendment of 1917 first quoted above, we are convinced that under the plain language of the statute existing when these transactions took place they had the power, if in their judgment a bidder was incompetent or unreliable for the performance of the work, to do either one of two things: they could accept the bid of the person who in their judgment was the lowest competent and reliable bidder, stating their reasons therefor, or, in the language of the statute, they could relet the same anew.

When its bid was made the *Gillen Company* doubtless knew that one of its salaried superintendents was one of the commissioners. William Gillen was repeatedly asked by members of the commission whether he was interested directly or indirectly in the *Gillen Company* and always replied in the negative. There was also testimony to the effect that he stated to them that he was not in the employ of the *Gillen Company*. George P. Miller was chairman of the commission and thoroughly understood the duties of municipal officers and the evils which arise when their duties to the public and their private interests conflict. At his direction inquiry was made of an officer of the *Gillen Company* and the real facts were ascertained.

With these facts before them the commission evidently believed that William Gillen was indirectly interested in the proposed contract and that the interests of the city demanded the rejection of the bid. It is our view that this action

should be commended and sustained. It is also our belief that if other public officers under similar circumstances used the same precautions and firmness the public interests would often be better subserved.

The word "indirectly" in the statute is not without meaning. If William Gillen had been a stockholder in the company there would have been such direct financial interest in the contract under the rule declared in many decisions as would come clearly within the prohibition of the statute. With a salary of $4,500 per year, his interest in the success of the company may have been much greater than if he had owned a small amount of stock.

It is argued by counsel for appellant that no injury would have been suffered by the city; that on the contrary there would have been a gain to the city of $3,607.50 if the *Gillen Company* bid had not been rejected. This is by no means certain. There were many ways in which much heavier losses to the city than this amount might be incurred in the performance of such a contract if a commissioner were more zealous to protect private than public interests. Moreover, actual loss to the public is not the principle on which the law proceeds in condemning transactions of this kind. The law seeks to avoid situations where public officers are tempted to sacrifice the interests of the public to their own, which destroy faithfulness and fidelity in public service.

There are many decisions holding that contracts are invalid when made by a municipality or a board with a corporation having a stockholder who is also a member of the board or common council. In that case the public officer has a direct proprietary interest in the corporation. But we find very little authority on the exact question here involved, that is, whether contracts with a municipality made between a corporation having a salaried manager or employee who is also an officer of the city or board, are valid. We do not hold that under all circumstances a contract between a

municipality and a corporation having an employee who is also a public officer of the municipality would be invalid. The compensation of the employee might be so slight or his employment so transient that there would arise no conflict of interest. We do hold that under the facts proven in this case the commission and the trial court were justified in deciding that the *Gillen Company* was not a competent bidder.

It is claimed that at least after the resignation of William Gillen as a superintendent of the *Edward Gillen Company* the board could properly sign and execute the contract. But after he had participated in the proceedings as above stated the resignation came too late. If contracts could be thus made and consummated by public officers holding interests adverse to the public after participating in the preliminary proceedings, the statute would be shorn of its usefulness. The taint cannot be so easily removed.

The second and third assignments of error are in substance that the court erred in holding that *Conrad Niederman* was qualified to vote on the award of the contract to the *Great Lakes Company* and in holding that the contract was valid. *Mr. Niederman* never had any financial interest whatever in this company. Ten years before, he had disposed of all his interest in its predecessor. The trial court found that he had "never been a stockholder or officer of said *Great Lakes Dredge & Dock Company,* and has never been directly or indirectly pecuniarily interested in said corporation." It is true that he had a son who was directly interested in the company and one of its officers.

The decisions are to the effect that contracts may be legally made by a municipality although a relative of the bidder is one of the governing board or council. In such a case there is no direct or indirect interest in the contract. *Lewick v. Glazier,* 116 Mich. 493, 500, 501, 74 N. W. 717; *Cason v. Lebanon,* 153 Ind. 567, 55 N. E. 768.

*Mr. Niederman* was a stockholder in a company which leased some land to the *Great Lakes Company*. There is no proof that the company is not solvent, that it has not paid its rent promptly, or that the land would not rent for an equal amount to another customer. *Niederman* frankly told the facts to the commission. The commissioners evidently believed that he had no such connection with the *Dredge Company* as would influence his conduct or tend to prevent him from faithfully serving the public. We find no error in the conclusion of the circuit court that the contract was properly let to the *Great Lakes Dredge & Dock Company*.

Respondents urged that appellant had waived its right to maintain this action by laches, and also by bringing an action on February 18, 1920, against the city of *Milwaukee* for $60,000 damages alleged to have been suffered by its refusal to execute and carry out the contract with the plaintiff. It is unnecessary to decide these questions.

*By the Court.*—Judgment affirmed.

OWEN, J., dissents.