HEFFERNEN, Appellant, vs. CITY OF GREEN BAY and another, Respondents.

*April 5—May 4, 1954.*

536

For the appellant there were briefs by *Welsh, Trowbridge, Wilmer & Bills* of Green Bay, and oral argument by *George E. Bills* and *Rodney C. Welsh.*

For the respondent city of Green Bay there was a brief and oral argument by *Clarence W. Nier,* city attorney.

For the respondent Chester McDonald there was a brief by *Evrard, Evrard, Duffy, Holman & Faulds* of Green Bay, and oral argument by *Raymond E. Evrard* and *Joseph P. Holman.*

STEINLE, J. This action arose out of the execution of a written contract dated August 25, 1953, between the respondent, city of Green Bay, and the respondent, Chester McDonald, for the dismantling of an old bridge and the construction of a new one over the East river at North Webster avenue in Green Bay. Appellant contends that the contract is invalid for the reason that Alderman Otto Rachals was an employee of the respondent, Chester McDonald, at the time of the letting of the bids and the execution of the contract for the bridge project. It is the position of the respondents that Rachals was not such employee when McDonald entered his bid or at the time when the contract was awarded to him and that Rachals had no direct or indirect interest in said project.

The record indicates that the authorities of the city of Green Bay as early as the spring of 1951 had decided to

replace the bridge in question and at that time had advertised for bids. Waterways Engineering Corporation, a corporation, in which appellant holds office, Chester McDonald, the respondent, and others entered bids. A contract was awarded to Waterways Engineering Corporation at the time, but subsequently that organization at its own request was relieved by the city from responsibility of performance of the contract. In April, 1953, the city of Green Bay again asked for bids and Waterways Engineering Corporation submitted a low bid. McDonald did not bid at the time. The bid of Waterways Engineering Corporation was rejected because it had included certain conditions as to performance and the contract was awarded to another firm. However, that firm later asked to be relieved from the contract and the city of Green Bay consented to such request.

Sometime prior to July 30, 1953, the city of Green Bay again advertised for bids for the reconstruction of the bridge. The respondent, Chester McDonald, along with others, submitted a bid and on August 17, 1953, the bids were opened and considered by the board of public works of the city and that body after being advised that Rachals was not in the employ of McDonald Lumber Company, recommended the award of the contract to Chester McDonald as the lowest bidder. On August 18, 1953, the city council by resolution awarded the contract to McDonald. Alderman Otto Rachals was excused from voting. The resolution of the council was adopted by a vote of 18 to 4. Before commencement of the work on August 31, 1953, the appellant, R. A. Heffernen, made a written demand upon the city council to declare the contract void because of the employer-employee relationship that existed between McDonald and Rachals, or in the alternative to commence judicial proceedings for determination of the validity of the contract. Rachals, as alderman,

opposed the request that the city seek a judicial determination of the matter. The city declined the demands of the appellant, R. A. Heffernen. This action was commenced on September 1, 1953.

For more than seven years immediately prior to February 1, 1953, Otto Rachals was an employee of a Green Bay co-operative merchandising and automobile service-station establishment earning $60 per week. On February 3, 1953, he became employed by the respondent, Chester McDonald, as a clerk in the hardware store and retail division of McDonald Lumber Company. His wage was $60 per week. He continued in that employment until August 13, 1953, when he learned that the respondent herein, Chester McDonald, had planned to file a bid with the city of Green Bay for the construction of the bridge. Rachals informed McDonald that he would have to resign his position with the McDonald Lumber Company because the legality of a bridge-contract letting under the circumstances would be questionable and Rachals did not desire to become involved. Before Chester McDonald submitted his bid on August 13, 1953, Rachals' resignation was tendered and accepted. On August 14, 1953, Rachals became employed by McDonald Motor Sales Company which operated an automobile distributorship, garage, and service station and which business was owned individually by James McDonald, a son of the respondent Chester McDonald. Rachals' duties with McDonald Motor Sales Company were those of serviceman and filling-station attendant, which was the type of employment in which Rachals had been partially engaged while working for the co-operative concern before his employment by Chester McDonald. On August 17, 1953, when the bids for the construction of the bridge were opened, Rachals was no longer in the employ of the McDonald Lumber Company. Upon the trial Rachals admitted in his testimony that on a few occasions between August 14, 1953, and August 27, 1953, while

visiting at McDonald Lumber Company either on a social or business basis, he waited on customers of said lumber company, particularly serving some who were in a hurry but that such service was voluntary and gratuitous on his part.

The appellant, R. A. Heffernen, contends that the transfer or change of employment of Rachals from the McDonald Lumber Company to the McDonald Motor Sales Company was a subterfuge and that for all intents and purposes Rachals at the time of the letting of the contract was actually an employee of Chester McDonald and continued as such until the time of the trial.

In its decision the learned trial court referring to this subject, found:

"The evidence in the case is that James McDonald, age twenty-four, and a son of Chester McDonald, Sr., had been previous to his entry into the armed forces an employee of his father in the lumber company for a period of two years; that he went into the armed forces where he remained for a period of approximately two years; that he returned about Christmas time in 1952 and went back to work in the office until April 1, 1953, when he took over the Packard agency and started the McDonald Motor Sales. Prior to April 1st the Packard automobile agency was operated by the East-West Motors, the principal owner being one Raymond Hudson, who notified the Packard Motor Car Company in the early part of March, 1953, that he was terminating such agency effective as of April 1, 1953. The Packard Motor Car Company, through its field representative, one Jeremiah Ford, was instructed to seek a new agency for the Packard Motor Car Company and he contacted Chester McDonald, Sr., sometime around the middle of March. Chester McDonald informed Mr. Ford that his son James wanted to change his employment and probably would be interested in the agency. The necessary details, such as financing, were discussed by Mr. Ford and Chester McDonald, Sr., and it was agreed shortly thereafter that James McDonald would take over the agency under the name of the McDonald Motor Sales.

"It is undisputed that Chester McDonald, Sr., father of James McDonald, financed the transfer of the franchise to the McDonald Motor Sales and obligated himself by indorsing a note at a local bank, so that it was necessary for Chester McDonald to extend his credit at the bank and advance certain moneys and make a gift to his son amounting in the aggregate to about $40,000.

"Mr. Ford was hired as a sales manager of the company, his testimony being that he was hired by Chester McDonald and not James McDonald. The state of Wisconsin issued an automobile-agency license to James McDonald and all income-tax, social-security records and other documentary evidence indicates that James McDonald was the owner on the surface of the McDonald Motor Sales. Mr. Ford testified further that it was necessary for him in several instances to clear transactions with Chester McDonald, Sr., and that on the 8th of June, 1953, he was discharged from his employment by Chester McDonald. Three other former employees of the East-West Motors testified that they had applied to Chester McDonald for employment with the McDonald Motor Sales, but none of them was employed.

"The plaintiff contends further that these and other transactions are definite proof that James McDonald is merely a figurehead of the McDonald Motor Sales and that in truth and in fact it is under the complete control, domination, and influence of Chester McDonald, Sr., and that to all intents and purposes Otto Rachals remains an employee of Chester McDonald.

"The court has carefully analyzed the evidence in this case and is not convinced that Chester McDonald and the McDonald Motor Sales is one and the same in so far as the business is concerned. Chester McDonald undoubtedly has considerable, if not a dominant, influence in the policies of the McDonald Motor Sales, but the court believes that this is a natural result of a parent and child relationship which exists in this case between Chester McDonald and James McDonald. The father in this case has advanced and given to his son money and obligated himself considerably, with the result that he is naturally interested in the success of the garage business. Because of such relationship and the father

having obligated himself and advanced substantial money, has resulted to a considerable extent in James McDonald acquiescing and permitting his father to influence him and assume a dominant position in the conduct of the business, which is entirely natural.' The court does not conclude from the evidence that, as the plaintiff claims it should, the Mc-Donald Motor Sales is owned 'lock, stock, and barrel,' to use the common vernacular, by Chester McDonald, Sr."

The trial court in its written decision also indicated that had Rachals in fact been an employee of Chester McDonald, such relationship of employer-employee under circumstances as here would not be sufficient to void the contract. Such conclusion was premised upon the view that the duties of Rachals were ministerial and that his compensation was modest and that such type of service and compensation did not create an interest directly or indirectly in the contract between McDonald and the city.

It is our opinion that had Rachals in fact been an employee of Chester McDonald the contract then would have been illegal and void. Sec. 62.09 (7) (d), Stats., provides in part:

"No city officer shall be interested, directly or indirectly, in any improvement or contract to which the city is a party, and whenever it shall appear that such is the case such contract shall be absolutely null and void and the city shall incur no liability whatever thereon."

This statute in spirit is in conformity with the long-established public policy of this and other states that a public officer in the discharge of his duties as such shall be absolutely free from any influence other than that which grows out of the obligations that he owes to the public at large. As was well said in *Stockton Plumbing & Supply Co. v. Wheeler* (1924), 68 Cal. App. 592, 601, 229 Pac. 1020, 1024:

"The principle upon which public officers are denied the right to make contracts in their official capacity with themselves or to be or become interested in contracts thus made is evolved from the self-evident truth, as trite and impregnable as the law of gravitation, that no person can, at one and the same time, faithfully serve two masters representing diverse or inconsistent interests with respect to the service to be performed."

In *Edward E. Gillen Co. v. Milwaukee* (1921), 174 Wis. 362, 183 N. W. 679, this court held that subject to certain exceptions a contract made between a city and a corporation having an employee who was also an official of the city is invalid. The exceptions deal with circumstances where the compensation of the employee is slight or the employment so transient that no conflict of interest would arise.

Had Rachals continued in the employment of McDonald Lumber Company after Chester McDonald had submitted his bid for the bridge contract it could be said that he might easily have benefited personally thereby either during the pendency of the contract or thereafter, through promotion, wage increase, more certain tenure, or other similar kind of consideration. Such contract would have been void because of Rachals' indirect interest in it as proscribed by the statute. Under such circumstances it would have been immaterial that Rachals in his capacity as alderman did not vote upon the awarding of the contract. The contract still would have been void. However, here the trial court found that while Rachals was a member of the city council when the contract was awarded to Chester McDonald, nevertheless, he was not McDonald's employee in any capacity at the time or thereafter, and that Chester McDonald at no time in question was owner in whole or part of McDonald Motor Sales Company, the concern with which Rachals became identified after leaving the employ of McDonald Lumber Company. There is competent evidence in the record to sustain such findings.

Appellant maintains that inasmuch as Rachals had resigned from his employment only a very short time preceding the award of the contract to Chester McDonald by the city council, the situation is comparable to that in the case of *Edward E. Gillen Co. v. Milwaukee, supra,* where Gillen had also resigned his position. However, there is distinction in that Gillen resigned his official position with the city after the contract had been awarded. Gillen had not revealed his connection with the Gillen Company until after the contract had been let and when ascertainment was made by the commission of his interest in the Gillen Company. This court in the *Gillen Case,* commenting upon the resignation, at page 372, said:

"But after he [Gillen] had participated in the proceedings as above stated the resignation came too late. If contracts could be thus made and consummated by public officers holding interests adverse to the public after participating in the preliminary proceedings, the statute would be shorn of its usefulness. The taint cannot be so easily removed."

In the instant situation it appears that Rachals' attitude and conduct in personally severing his employment relationship with McDonald Lumber Company when informed of Chester McDonald's disposition to enter a bid for the contract with the city unequivocally indicated a desire on his part at the time to serve but one master, and that the city of Green Bay in this matter. There is no showing here that Rachals participated in preliminary proceedings regarding the contract as did Gillen in the earlier case. It was after Rachals gave expression of his determination to resign as an employee of McDonald Lumber Company that arrangements were discussed regarding an opportunity for him to work for McDonald Motor Sales Company. Rachals was excused from voting when the contract award was considered by the council. Although he opposed the demand for a judicial

determination of the controversy, the record indicates and the court found that he was not in the employ of McDonald at the time. The entire record herein reflects good faith on Rachals' part in all of these respects and the trial court found nothing to the contrary.

Appellant points out that Rachals waited on customers at the McDonald Lumber Company after the contract was awarded. Such factual situation is borne out by the evidence, but it is not shown that Rachals acted in a manner other than to be accommodating. He received no compensation, bonus, or commission for such services. Rachals' conduct in this particular falls within the exception referred to in *Edward E. Gillen Co. v. Milwaukee, supra,* to wit, transient services of but small consequence.

There is no evidence that McDonald Motor Sales Company had any interest in the contract between Chester McDonald and the city nor is there showing that said agency would furnish material or services in connection with the performance of it. Objection has been voiced on two grounds, first, that Chester McDonald actually owns McDonald Motor Sales Company and further, that if he does not, he is a part of it by virtue of his interest in his son's success and the personal attention that he gives to that business. There is no evidence that Chester McDonald possesses any pecuniary interest, direct or indirect, in McDonald Motor Sales Company. That enterprise was a gift from the father to the son without any financial reservation and the son alone enjoys the pecuniary advantages that flow therefrom. We fail to perceive any connection between Chester McDonald's interest in his own contract with the city of Green Bay under the facts here and his paternal interest in the success of his son which would link Rachals' position to Chester McDonald within the purview of sec. 62.09 (7) (d), Stats. The relationship is too remote. It is doubtful that the point would have been raised had

Rachals taken his job with McDonald Motor Sales Company when it commenced business in the spring of 1953, and although he had remained as an alderman and was such when the city's contract was awarded to Chester McDonald.

Rachals' transfer from McDonald Lumber Company to McDonald Motor Sales Company does not appear to have been a subterfuge whereby Rachals could continue to work for Chester McDonald. From the record it seems that it was a *bona fide* change of employment arranged because Rachals in fact chose not to remain in the employ of Chester McDonald when he learned that Chester McDonald was about to negotiate for a contract with the city. It further appears from the record that when Rachals decided to leave the employ of McDonald Lumber Company, James McDonald required in his business the services of an employee with Rachals' qualifications. Apparently Rachals got the job because there was a vacancy and because he had the ability to fulfil the duties. It does not appear that this was a situation where a job was created to take care of Rachals. In view of the trial court's findings it cannot be said that Chester McDonald remained the employer of Rachals or that he could authoritatively provide benefits for him, that might fall within the category of "indirect interests."

In the case of *Edward E. Gillen Co. v. Milwaukee, supra,* a situation is set forth wherein a father, Conrad Niederman, sitting as vice-chairman of the city sewage commission voted to award a contract to a company, Great Lakes Dredge & Dock Company, in which his son was a stockholder and officer. The son had acquired stock by gift from the father in Starke Dredge & Dock Company and, through the express wishes of his father, became a director of that concern. That company sold its interests to Great Lakes Dredge & Dock Company, to which concern the contract was awarded. It was also established that when the contract was awarded, the father owned stock in D. & D. Land Company which owned

and leased to Starke Dredge & Dock Company the yard of the latter. The yard was taken over by Great Lakes Dredge & Dock Company, and at the time of the awarding of the contract said company held it under lease from the D. & D. Land Company in which the father owned stock. The father had explained all of these facts to his fellow commissioners before voting on the contract. This court in its opinion commenting upon such situation, at page 373, said: "The commissioners evidently believed that he had no such connection with the Dredge Company as would influence his conduct or tend to prevent him from faithfully serving the public." The court sustained the validity of the contract.

At page 372 in *Edward E. Gillen Co. v. Milwaukee, supra,* this court said:

"The decisions are to the effect that contracts may be legally made by a municipality although a relative of the bidder is one of the governing board or council. In such a case there is no direct or indirect interest in the contract. *Lewick v. Glazier,* 116 Mich. 493, 500, 501, 74 N. W. 717; *Cason v. Lebanon,* 153 Ind. 567, 55 N. E. 768."

It is apparent that in the instant situation the trial court was of the opinion that the alderman's connection with the son's business was not of such character as would influence his conduct or tend to prevent him from faithfully serving the public. We are constrained to hold that, under these circumstances, Rachals was not disqualified from participating in the official consideration of the contract and that the action of the city of Green Bay in letting the contract to Chester McDonald was not illegal or void because of Rachals' status as an alderman and his employment by James McDonald immediately following the entry of the bid by Chester McDonald.

*By the Court.*—Judgment affirmed.