GOLDING, STATE AUDITOR *v.* SALTER, et al.

No. 40898 December 8, 1958 107 So. 2d 348

568

*Lester C. Franklin,* Asst. Atty. Gen., *Matthew Harper, Jr.,* Asst. Atty. Gen., Jackson, for appellant.

*Sanford & Alford, Prisock & Prisock,* Philadelphia; *Snow, Covington & Shows,* Meridian, for appellees.

574

Kyle, J.

The State Auditor of Public Accounts brought suit in the Circuit Court of Neshoba County, under authority of Section 3877-05, Mississippi Code of 1942, Recompiled, (Ch. 202, Laws of 1948, as amended by Ch. 176, Laws of 1952), against L. G. Salter, Administrator, and Grady Lane, Glen Jackson, Holley Henley, Howard Reagan and Ben Watkins, members of the Board of Trustees of the Neshoba County Hospital, and also the United States Fidelity and Guaranty Company, surety on the official bond of L. G. Salter, seeking to recover large sums of money belonging to the county hospital alleged to have been misappropriated, or otherwise illegally expended

by said administrator and said board of trustees during the fiscal year beginning October 1, 1954, and ending September 30, 1955. The declaration, as filed, included a demand for the repayment of money alleged to have been illegally collected from the State Hospital Commission as reimbursement for the cost of services rendered to charity patients. But the declaration was amended, and that item was eliminated before the case was called for trial.

The plaintiff alleged in his declaration that the said administrator and said board of trustees, on or about December 20, 1954, paid to certain employees of the hospital sums of money designated as Christmas bonuses, in the total sum of $285, which payments were made in direct violation of Section 66 and Section 96 of the Constitution of 1890; that said administrator and said board of trustees, during the above mentioned fiscal year, issued checks drawn on the hospital funds to doctors and patients either as refunds or rebates, without warrant of law and in direct violation of Section 66 of the Constitution of 1890, which refunds and rebates total the sums of $4,634.79; that, under the direction of said administrator and said board of trustees, gifts were made from the "Employees Insurance Fund" to divers and sundry persons, including members of the board of trustees, totaling $412.35, all in direct violation of Sections 66 and 96 of the Constitution of 1890; that two of the trustees, namely, Howard Reagan and Glen Jackson, sold eggs and beef to the hospital for which they were paid the total sum of $1733.40, in violation of Section 109 of the Constitution of 1890 and contrary to the provisions of Section 9027, Code of 1942, Recompiled, (Chapter 292, Laws of 1950); that said administrator and said board of trustees made purchases of meat for the hospital in the amount of $322.25, without advertising for bids therefor, and paid for the same out of hospital funds, without demanding or receiving itemized invoices covering the

same, in violation of Section 9027, Code of 1942, Recompiled, (Chapter 292, Laws of 1950).

The plaintiff also alleged in his declaration that the defendant L. G. Salter was paid the sum of $475 in excess of the amount of salary and authorized expenses which he was entitled to receive as administrator for the fiscal year, and that Mrs. Vertice Bozeman, who was employed as bookkeeper for the hospital, was paid the sum of $175 in excess of the amount of salary which she was entitled to receive under her contract of employment for said fiscal year, all in direct violation of Section 96 of the Constitution of 1890; and that the sum of $47.50 had been unlawfully expended out of hospital funds for the purchase of flowers for employees.

The plaintiff further alleged that the members of the board of trustees and said administrator had authorized and paid to the members of the board of trustees per diem allowance during the fiscal year in the sum of $300 each as compensation for their services as trustees, and that, in addition thereto, the sum of $503.80 had been appropriated out of hospital funds for the payment of premiums on hospital insurance policies for the members of the board and the attorney for the board, all in direct violation of Section 4048, Code of 1942, Recompiled. Itemized statements of each of the above mentioned groups of expenditures were attached to the declaration; and the total amount sought to be recovered was $10,089.09. The plaintiff further alleged that written demand had been made upon the above named trustees and said administrator for the repayment of the above mentioned illegal expenditures, but despite said written demand, the said defendants had failed and refused to pay the same.

In their answer the defendants admitted that the defendant Salter had paid to certain employees of the hospital Christmas bonuses in the amount stated in plaintiff's declaration. The defendants stated, however, that

the so-called Christmas bonuses were paid as a reward for faithful services, and if such payments were not authorized by law, they were made in good faith, and none of the defendants derived any personal gain therefrom. The defendants denied that the administrator had issued checks to doctors and patients, either as refunds or rebates, as alleged in the plaintiff's declaration, in the amount of $4,634.79; and the defendants averred that all of the items listed in the schedule of refunds or rebates attached to plaintiff's declaration represented items of money belonging to the patient or the doctor, or other person to whom such payments were made, and that none of the money belonged to the hospital. The defendants admitted that certain gifts were made, as shown in Schedule "F" attached to the plaintiff's declaration, and listed as "Expenditures for Gifts from Employees Insurance Funds", amounting to $142.35. But the defendants averred in their answer that the gifts were not made from the funds of the hospital or other public funds, but from profits realized from the operation of soft drinks and candy vending machines placed in the hospital for the convenience of employees. As to the item of $235 included in these gifts, the defendants stated that that item represented five chairs which were given by the employees to the five members of the board of trustees, without any suggestion being made by the trustees as to such gifts; that the trustees understood and believed that the chairs were given to them by the employees whose names were signed to the gift card, and if there was anything wrong about the gifts each trustee was perfectly willing to return his chair over to the hospital or to reimburse the employees insurance fund for the amount expended for the gift.

The defendants admitted in their answer that the administrator had purchased from Howard Reagan, a member of the board of trustees, during the fiscal year, eggs and beef in the amount of $1342.20, and that the adminis-

trator had purchased beef from Glen Jackson, a member of the board of trustees, in the amount of $391.20, and that payments had been made therefor to the said trustees out of the hospital funds, as alleged in the declaration. The defendants averred in their answer, however, that the purchases of the eggs and beef were made at a time when it was difficult to obtain a supply of fresh yard eggs and at a time when the hospital was unable to procure beef of a quality desirable and necessary to be fed to the patients in the hospital at reasonable prices; that there was no contract between the trustees and Reagan and Jackson for the purchase of said eggs and beef, but the purchases were spot purchases and were necessary and proper, and that the purchases were all made in good faith.

The defendants admitted in their answer that the board of trustees had authorized the payment to L. G. Salter, administrator, the sum of $475 and to Mrs. Vertice Bozeman $175 as alleged in the declaration but the defendants averred that the sum of $475 had been paid to L. G. Salter to cover travel expenses actually incurred by him during the year, and that the sum of $175 had been paid to Mrs. Vertice Bozeman for extra work done by her over and above the work required of her under her contract. The defendants admitted that the per diem allowances referred to the declaration had been paid to the board members, as shown in the exhibit attached to the declaration, and that certain items of insurance for the members of the board and the board's attorney had been paid out of the hospital funds. The defendants averred, however, that they had been informed and believed that the board members were entitled to reasonable compensation for their services; that the board of supervisors of Neshoba County had entered an order upon its minutes providing for such compensation; and that the allowance of compensation had been made in good faith, and if the court should hold that such compensation was not author-

ized by law, the defendants were ready to refund the amounts allowed. The defendants also averred in their answer that, in making all of the above mentioned expenditures they had acted in good faith and with an honest purpose, and without any intention of violating the law or profiting from any transaction; and that if any of the expenditures complained of were unlawful, they were made as a result of honest mistakes; and that if it should develop from the proof that any of the expenditures were unlawful the defendants were nevertheless not personally liable for an honest error of judgment in respect thereto, that the defendants were public officers charged with the duties of exercising their best judgment and discretion in the performance of their official duties and were not liable for errors committed in the exercise of their judgment and discretion.

The case was tried before a jury at the October 1957 term of the court. Most of the evidence offered on behalf of the plaintiff consisted of the cancelled checks issued by the hospital authorities showing the expenditures mentioned in the declaration. These checks were identified by Ed Pettus, Field Auditor for the State Department of Audit, who testified as the chief witness for the plaintiff.

L. G. Salter was the main witness who testified for the defendants. Salter testified that the Christmas bonuses for which checks were issued on December 20, 1954, were given to the employees for extra work performed during the Christmas Holidays. Salter was questioned at length concerning the checks issued to doctors and patients in the total amount of $4,634.79, which were listed in Exhibit "E" attached to the plaintiff's declaration as "Checks issued to Doctors and Patients as Refunds or Rebates where the Records do not show any Justification for Refunds or Rebates." There were 117 checks listed under that heading. Approximately one-half of the checks were issued to doctors, and the remaining one-half

were issued to patients. Salter testified that the checks were issued in payment of amounts justly due the payees therein named out of funds received by the hospital from the patients or hospital insurance companies for the accounts of the patients. Salter admitted that payments were made to the doctors in many cases where the patient's account card did not show any sums collected for the doctor, and that refunds were made to patients in many cases where the patient's account did not show the total amount received by the hospital or the amount of refund due the patient. Salter's testimony indicated an utter lack of proper bookkeeping procedures which would enable the trustees and the state department of audit to make a proper check of receipts and disbursements of the hospital funds by an examination of the records only, without having the benefit of his own verbal explanations of the record entries. But Salter made a fairly intelligent explanation of each payment made to the doctors and patients to whom checks had been issued, and no rebuttal evidence was offered for the purpose of contradicting Salter's claim that the amounts paid were justly due and owing to payees therein named.

In answer to questions propounded to him concerning the gifts made to doctors, members of the board of trustees, and other persons, from the ''Employees Insurance Fund,'' Salter stated that the ''Employees Insurance Fund'' was a fund which was carried on the books as a separate account apart from the regular hospital fund account. The employees carried group insurance policies with the Blue Cross, and the employees paid the monthly premiums on their hospital insurance policies into the ''Employees Insurance Fund,'' and one check was issued to the Blue Cross to cover all policyholders in the group. The Blue Cross permitted the employees to include in their group policyholders who were not employees of the hospital, and the premiums paid into the

"Employees Insurance Fund" by all of the policyholders amounted to large sums of money. In time, other miscellaneous deposits were made and credited to the "Employees Insurance Fund," which had no relation to the group insurance premium payments. These miscellaneous deposits included profits derived from the sales of coca cola and other soft drinks and candy from vending machines installed in the hospital, toll charges collected on long distance telephone calls made by hospital employees or visitors; rentals received from cots belonging to the hospital; and the purchase price of drugs which were paid for in cash, and other small items derived from miscellaneous sources. It was from these funds, which were not treated as hospital funds that the gifts referred to as "Gifts from the Employees Insurance Fund" were paid. Salter stated that the "Employees Insurance Fund" account was closed upon the advice of the auditor after the audit was completed, and the balance in the fund was transferred to the hospital fund.

Salter admitted that he had purchased eggs and beef from Howard Reagan, a member of the board of trustees, during the fiscal year in the total amount of $1,342.20 as shown in Exhibit "G" attached to the declaration. He also admitted that he had purchased beef from Glen Jackson, a member of the board of trustees, on two occasions, and that the total amount paid therefor was $391.20. He also admitted that he had purchased beef from his father, B. G. Salter and Hazel Henry, in the total amount of $322.25, and that he had made payments therefor out of the hospital funds without obtaining itemized invoices showing the amounts purchased or the unit price paid therefor. Salter was asked whether the purchases of eggs and beef from Mr. Reagan and Mr. Jackson were listed on the claims docket among the claims which the board of trustees approved for payment. His answer was that the items were listed as claims on the claims docket, and that the board of trustees approved the same

and authorized the payment of same. Salter stated that the additional sum of $475 paid to him over and above the $4125 salary which his contract called for, was allowed by the board and was paid to him for traveling expenses incurred by him during the fiscal year, and that the $175 paid to Mrs. Vertice Bozeman, the bookkeeper, was for special services rendered by her in assisting the substitute bookkeeper during the period of time covered by a leave of absence granted to Mrs. Bozeman when she was not drawing her regular salary. Salter also admitted that he had purchased flowers for funerals of members of the families of the hospital employees on four occasions, the total cost of which amounted to $47.50, and that the flowers had been paid for by checks drawn on the hospital funds.

Howard Reagan testified that he had sold beef and eggs to the hospital during the time mentioned in the plaintiff's declaration, and that the prices received by him for the beef and eggs were the prevailing market prices. Glen Jackson testified that he had sold beef to the hospital, that Salter had called to see him about purchasing the beef, and that the beef was sold at the prevailing market price. Both witnesses stated that at the time the allowances were made to them for the purchase price of the beef and eggs they believed that the allowances were proper. Mrs. Ethel Beall, a member of the board of supervisors of Neshoba County, testified that representatives of the State Hospital Commission, recommended that the trustees be paid a per diem for their services, and the board of supervisors adopted an order on November 8, 1948, which provided that the members of the board should be paid $5 per day for the time actually spent in the discharge of their duties.

At the conclusion of the evidence the court instructed the jury to find for the plaintiff for the $503.80 appropriated out of hospital funds for the payment of premiums on hospital insurance for the members of the board of

trustees and their attorney. The court instructed the jury for the defendants that if they believed from the evidence that the Christmas bonuses given to the employees, which amounted to $285, represented payments made for services actually rendered by the employer to the hospital, and that the hospital got value received, they should find for the defendants as to those items. The court also instructed the jury for the defendants that, if they believed from the evidence that the payments listed in Exhibit "E" as refunds and rebates paid to doctors and patients represented money which did not belong to the hospital, but was money to which the payees were entitled, they should find for the defendants as to those items. The court instructed the jury for the defendants that, if they believed from the evidence that the items referred to as "Gifts from the Employees Insurance Fund," aggregating the sum of $412.35, were purchased with money which belonged to the employees and not to the hospital, they should find for the defendants as to those items. The court instructed the jury for the defendants that if they believed from the evidence that the beef and eggs purchased from Howard Reagan and Glen Jackson, members of the board of trustees, were actually delivered to the hospital and were sold at no more than the prevailing market prices at the time, and that the hospital got value received, they should find for the plaintiffs as to those items. A similar instruction was given to the defendants as to the purchases of beef made from Hazel Henry and B. G. Salter. As to the four small items listed as "Flowers Purchased from Hospital Funds," which amounted to $47.50, the court instructed the jury for the defendant that if they believed from the evidence that the flowers were purchased and sent to the families of the deceased for the sole purpose and intent of promoting the good will of the hospital, and that the best interest of the hospital was served by the purchase and sending of the flowers, they should find for the defendants on

those items. The court also submitted to the jury the question whether or not the payment of the sum of $475 to L. G. Salter was made for actual travel expenses and not as a payment of salary in excess of his contract, and the question whether or not the payment of the sum of $175 to Mrs. Vertice Bozeman represented payment for extra services actually rendered by her, as testified by the defendant Salter.

As to the payment of per diem compensation made to the members of the board of trustees, the court instructed the jury for the defendants that, if they believed from the evidence that the payments were allowed by the hospital board in good faith and for honest motive, but in a mistaken exercise of the power of the board to allow such compensation to its members, and if the jury believed from the evidence that the board members believed that the facts existed which justified said allowances, the jury should find for the defendants as to those items.

The jury returned a verdict for the plaintiff for $503.80, being the amount of the insurance payments made out of the hospital funds for the trustees and their attorney.

The appellant's attorneys assign as errors the action of the court in granting each of the instructions requested by the defendants to which reference has been made above, and the refusal of the court to grant the peremptory instructions requested by the plaintiff directing the jury to return a verdict for the plaintiff for each group of items sued for. Other errors are also assigned, but in view of the conclusions that we have reached on the assignments of error in the instructions, it is not necessary that we discuss the other points mentioned in the appellant's brief.

▆▆ ▆ Public boards created by legislative act have only such powers and authority as are expressly conferred by law, or as arise by necessary implication. Acts of such boards which do not come clearly within the

powers granted, or which are expressly prohibited by the Constitution, are void. Other acts, which if done in a regular or authorized manner would be valid, may be deemed invalid because of the board's failure to comply with statutory requirements.

The question of liability or nonliability of a public officer for the wrongful act of a corporate body of which he is a member, in the absence of a statute imposing such liability, has given the courts trouble.

Section 7129-55, Code of 1942, Annotated, Recompiled, provides that, any hospital erected, owned, maintained and operated thereunder by a county shall be operated by a board of trustees to consist of not less than five members, nor more than seven members, who shall be appointed by the board of supervisors and shall serve for terms of five years from the dates of their respective appointments. The statute then provides that the board of trustees shall have charge of the maintenance and operation of the hospital and shall have full power and authority to promulgate and adopt suitable rules and regulations and to employ such persons as may be necessary to properly maintain and operate the hospital. Section 7129-57, provides that the board of trustees of any such hospital shall make and file each year with the governing authority of the county "a full report which shall contain a complete and correct accounting of all funds received and expended for hospital purposes * * *." But nothing is said in the hospital statutes about the legal liability of members of the board for the unauthorized or wrongful appropriation of hospital funds.

 Since we have no statute defining the legal liability of members of the board of trustees in a case of this kind, we must look to the rule of the common law and the decisions of our own Court for guidance. At common law a public officer acting judicially or quasi-judicially is not personally liable for an unlawful payment of public funds if he acted in good faith within the scope of the

subject matter over which he has been given jurisdiction, and this rule has been applied to a disbursing officer, making apparently lawful payment, on express orders from his superior, notwithstanding his superior's mistake, but a payment out of the public funds, although within the general field of the officer's jurisdiction, may be so clearly and distinctly one which the officer could not lawfully make as to bar him from the justification that it was done in good faith. 67 C. J. S. 410, Officers, par. 118 b (1); Paxton v. Baum, 59 Miss. 531; State to Use of Lincoln County v. Green, 111 Miss. 32, 71 So. 171; Miller v. Tucker, 142 Miss. 146, 105 So. 774; National Surety Co. v. Miller, 155 Miss. 115, 124 So. 251; Trantham v. Russell, 171 Miss. 481, 158 So. 143; Barnett v. Lollar, 197 Miss. 574, 19 So. 2d 748.

In Paxton v. Baum, supra, this Court had under consideration Section 1386, Code of 1871 (Section 2944, Code of 1942), relating to the personal liability of members of the board of supervisors for the appropriation of money to objects not authorized by law, and the Court held that members of the board of supervisors are not liable on their bonds for an allowance made by the board of supervisors, where the allowance was authorized by law, although the board disregarded the provisions of the statute in making such allowance. It was there held that the board, in making an allowance against the county, was acting in a judicial capacity, and the members of the board were not liable on their official bonds for an error or mistake if the money went to an object to which it could be lawfully applied; but the Court also held in that case that this rule did not apply where the members were making allowances to themselves for compensation, and the board could not act judicially where it was dealing with its own members. In its opinion in that case the Court said: "It is for a diversion of money from its legitimate objects, and not for appropriation to a proper object, although in an irregular or unauthorized manner,

that liability is imposed on members personally. It is what the money is appropriated to, and not how it is applied, that furnishes the test of personal liability for it. * * * The objects to which the boards may appropriate money are designated by law, and may be known to them; and, in all cases of doubt, they may resolve the doubt against the appropriation, and avoid risk of liability; and it may be supposed that for appropriations to objects not authorized by law, it was intended to make members of the boards of supervisors personally liable. But, in view of the well-settled rule of the common law that for errors or mistakes a public officer acting judicially or quasi judicially is not liable, it could not have been the purpose of the legislature to make members of boards of supervisors personally liable for errors or mistakes as to how to act in matters committed to such boards by law, and as to objects for which an appropriation of money is authorized to be made by them. It is when they disregard the law as to the objects to which it has devoted the public money, and divert it to some object to which the law has not devoted it, that personal liability attaches.''

In the case of State to Use of Lincoln County v. Green, supra, the Court had under consideration the question as to the personal liability of the county superintendent of education for issuance of illegal pay warrant to school teachers for amounts in excess of the amounts called for in their contracts. The Court held that there was no liability in that case, and in its opinion said: ''It will be borne in mind that the several matters complained of in the instant case were items of business within the jurisdiction of the county superintendent, and the services charged to have been illegally paid for were services inuring to the benefit of the county, and not to Mr. Green; and the payments actually made were, in the language of Judge Campbell, in reference to 'objects for which an appropriation of money is authorized.' ''

In the case of National Surety Co. v. Miller, State Revenue Agent, supra, the Court held that a public board and the members thereof, so long as they act in good faith and from honest motives, and there is no express statute making them liable, are to be protected from the consequences of an erroneous decision when the matter upon which the action was taken was one belonging to the general class of cases within the cognizance of such board, or as otherwise termed was within the scope of the subject matter over which the board has jurisdiction.

In the case of Barnett, Auditor, v. Lollar, supra, the Court again held that a public officer is not liable at common law for errors or mistakes made by him in good faith when acting judicially or quasi judicially within the scope of the subject matter over which he has been given jurisdiction; and that the county superintendent in issuing certificates against the school fund for the purchase of fire extinguishers and the payment of premiums on bonds executed by bus drivers, was performing quasi judicial duties, and where such certificates were issued in good faith, although erroneously under the law, the superintendent did not become liable on his official bond. The Court, however, in its opinion in that case said: ''What we have hereinbefore said in discussing the first of these questions deals with the general principles. We are not to be understood as holding, as respects the expenditure of public funds, that any payment, whatever it is will be without any personal liability on the part of the officer if only the purpose of the payment was somewhere within the general field of his jurisdiction. A payment may be within that general field and yet so clearly and distinctly one which the officer could not lawfully make as to bar him from jurisdiction in taking the position that he did it in good faith and honest error.''

 Applying the principles of law laid down in the above mentioned decisions to the facts disclosed by the record in this case, we think there was error in the court's

instruction to the jury that, if they believed from the evidence that the Christmas bonuses given to the empoyees, which amounted to $285, represented payments for services actually rendered and that the hospital got value received, they should find for the defendants as to those items. The order adopted by the board on December 8, 1954, recites that it was agreed by the board that the employees of the hospital "should be given a Christmas gift of $7.50 for each employee." It is true that the defendants stated in their answer that the amounts were intended as a reward for faithful services and that the payments were made in good faith. But the payments were nevertheless gifts to the employees, and no law has been cited, █ and we think that none can be cited, which vests in the board of trustees of a county hospital the right to make donations of public funds to private individuals. As stated by the Court in Joint Consolidated School District No. 2 v. Johnson, 163 Kan. 202, 181 P. 2d 504, "That a public officer entrusted with public funds has no right to give them away is a statement so obviously true and correct as to preclude the necessity for citation of many authorities." The Legislature has never authorized, or attempted to authorize, any subordinate state agency to make donations of public funds to employees as Christmas presents. And payments of that kind are so clearly and distinctly payments which the board of trustees in this case could not lawfully make as to bar the members of the board from claiming justification or immunity from liability therefor on the ground that the payments were made "in good faith and honest error."

(Hn 5) As to the items listed in Exhibit "E" attached to the plaintiff's declaration, under the heading, "Checks issued to Doctors and Patients as Refunds or Rebates," aggregating the sum of $4,634.79, we think there was no error in the action of the trial judge in submitting to the jury under proper instructions the question as to

the liability or non-liability of the defendants for the re-payment of those items. Salter's testimony that the checks were issued to the doctors and patients for money actually due them out of funds received by the hospital for their accounts clearly made an issue of fact for the jury to decide. Salter's testimony was neither contra-dicted nor discredited by the testimony of other wit-nesses. █ It was not inherently improbable, in-credible, or unreasonable, and could not be arbitrarily or capriciously disregarded or rejected, even though Sal-ter was an interested party. 32 C. J. S., Evidence, par. 1038, p. 1089. The jury had a right to accept Salter's testimony as true, and after a careful reading of the re-cord we think the jury was warranted in finding that the checks were issued to the doctors and patients for money actually due them out of funds received by the hospital for their accounts, and that plaintiff was not entitled to recover for those items.

 █ We also think there was no error in the action of the trial judge in submitting to the jury the question as to the defendants' liability for the repayment of the amounts listed in the plaintiff's declaration as ''Expendi-tures for Gifts from the Employees Insurance Fund,'' aggregating the sum of $412.35. The question whether the gifts referred to in the testimony of the witnesses were purchased with money that belonged to the em-ployees and not to the hospital was a question of fact for the jury to decide.

 █ As to the items of $475 paid to Salter over and above his regular salary, and the $175 paid to Mrs. Ver-tice Bozeman, the bookkeeper, the testimony shows that the $475 was paid to Salter to cover traveling expenses incurred by him while engaged in the performance of his duties as administrator during the year, and that the $175 was paid to Mrs. Bozeman for special services ren-dered by her while she was on leave of absence and was not drawing her regular salary. In making these allow-

ances, and the allowances to B. G. Salter and Hazel Henry for beef purchased from them for the hospital without competitive bids, the members of the board of trustees were acting in a quasi judicial capacity. The objects to which the money was appropriated were objects within the scope of the subject matter over which the board had jurisdiction; and it is admitted that the board members acted in good faith in making the allowances. This Court has repeatedly held that members of such boards are not personally liable for errors or mistakes made by them under such circumstances.

The attorneys for the appellant argue, however, that Par. (6) of Section 3877-05, Code of 1942 Recompiled (Sec. 5 of Ch. 202, Laws of 1948, as amended by Sec. 5 of Ch. 176, Laws of 1952), under authority of which the appellant sues in this case, creates a new statutory liability against public officers, employees and administrative bodies, for public funds illegally expended, which did not exist prior to its enactment, and that the rule of liability laid down by this Court in the cases cited above is no longer controlling in cases of this kind. But we think that par. 6, Section 3877-05, Code of 1942 Recompiled, only authorizes the state auditor of public accounts to make demand and institute suit against such public officers, employees and administrative bodies, for the recovery of public funds in cases where legal liability exists under the established rules of law. We do not think that it was the purpose or intention of the Legislature by the enactment of that statute to create a new rule of legal liability against such officers, employees and administrative bodies different from that which existed at the time of its enactment. As stated by this Court in Paxton v. Baum, supra, and Miller v. Tucker, supra, in view of the well-settled rule of the common law that for errors or mistakes a public officer acting judicially or quasi judicially is not liable, we think it could not have been the purpose of the legislature to make members of boards,

or other administrative bodies such as we have here, personally liable for errors or mistakes as to how to act in matters committed to such boards by law, and as to objects for which an appropriation of money is authorized to be made by them.

■■ ■■ We also think that the appellant was not entitled to recover the $47.50 expended for flowers purchased for the funerals of four members of the families of hospital employees. Hospitals are established for the care and treatment of the sick; and flowers are grown on the hospital grounds to beautify the landscape. Cut flowers are displayed in the waiting rooms, sun parlors and hallways of the hospital building to relieve the drabness of the hospital surroundings. It cannot be said that it is unlawful for the hospital authorities to expend money for the purchase of flowers under any and all circumstances; and we think the hospital authorities did not abuse their discretion or render themselves personally liable, in this case, when, as an expression of sympathy and as an act of good will, they purchased flowers for the funerals of the four members of the families of the hospital employees.

■■ ■■ As to the allowances made by the board of trustees to Howard Reagan and Glen Jackson, members of the board of trustees, for eggs and beef purchased from them during the fiscal year and paid for out of hospital funds, we think the trial judge erred in granting the instruction which authorized the jury to return a verdict for the defendants, if they believed from the evidence "that the beef and eggs were actually delivered to the hospital, were sold at not more than the prevailing market price at the time, and that the hospital got value received." The record shows that the purchases of eggs and beef from Reagan and Jackson extended over a period of several months. The purchases from Reagan aggregated the sum of $1342.20. The purchases from Jackson aggregated the sum of $391.20. All of the sales

were made by Reagan and Jackson to the hospital in violation of Section 109 of the State Constitution and in violation of Section 2301, Code of 1942, Recompiled; and the actions of the board of trustees in allowing the claims for the purchase price of the supplies under such circumstances cannot be justified upon the theory embodied in the above mentioned instruction, that the supplies were sold at the prevailing market price and the sellers were entitled to be paid therefor. The plaintiff, in our opinion, was entitled to recover the amounts of the allowances sued for.

Section 109 of the State Constitution of 1890 provides that:

"No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term."

Section 2301, Code of 1942, provides as follows:

"If any public officer or member of the legislature or any officer, or any purchasing board of public contracts shall be interested, directly or indirectly, in any contract with the state, or a district, county, city, town or village thereof, authorized by any law or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year, after the expiration of such term, he shall be guilty of a misdemeanor, and shall be fined a sum equal to double the value of the contract, or imprisoned in the county jail not less than one month nor more than one year. Instead of a criminal procedure against the officer or members of the board, committing the offense above defined, a civil proceeding

may be instituted against any officer or officers, or members of any board, or boards, so offending for double the value of the contract, by or on behalf of the state, county, municipality, or district so affected, as the case may be. * * *.''

In Noxubee County Hardware Company v. City of Macon, 90 Miss. 636, 43 So. 304, the Court held that the City of Macon was prohibited by the State Constitution from purchasing articles of merchandise from an alderman who owned and operated a hardware store, even if the purchases were ratified by the municipal board, and that it was utterly immaterial, whether Alderman Holberg sold goods cheaper than Alderman Horton, or whether either or both acted in good faith in whatever sales they made, or whether either or both sold the goods at a reasonable and fair price while they were aldermen; and the Court held that the complainant, who sued as a taxpayer, was entitled to an injunction to prohibit such purchases.

In State v. Levee Commissioners, 96 Miss. 677, 51 So. 211, the Court held that under Section 109 of the Constitution of 1890, a contract could not lawfully be made by the board of levee commissioners employing one of its members as a lawyer to assist its regular attorney in the defense of suits against it, since the board is an agency created by the state for administering the affairs of the levee district.

In the case of Miller v. Tucker, supra, the Court held that a member of the board of supervisors who had made contracts with the county in violation of Section 109 of the Constitution of 1890, was liable on his official bond for the amounts so received, and that the other members of the board participating in the allowance were liable on their bonds for the amounts so allowed. The Court in its opinion in that case said: ''It is next contended by the revenue agent that he should have been allowed the recovery of the sum of eighty-four dollars and thirty-

five cents, allowed E. S. Martin while a member of the board of supervisors, and the sum of sixty-three dollars allowed him within a year after he went out of office, at a time when he was prohibited by Section 109 of the Constitution of the state from being directly or indirectly interested in any contract of said district, county, or town, authorized by any law or order made by the board of which he was or may have been a member, and in violation of Section 364, Code of 1906, on the same subject, and also in violation of Section 1305, Code of 1906, making it a criminal offense to be so interested. We think the revenue agent should have been permitted to recover for these items.''

Payments for supplies sold to the hospital by members of the board of trustees themselves, in violation of Section 109 of the State Constitution and in violation of the above mentioned criminal statute, are so clearly and distinctly payments which the board of trustees in this case could not lawfully make as to bar the members of the board from claiming justification or immunity from liability therefor on the ground that they were acting in a quasi judicial capacity, and that the payments were made in good faith and honest error.

██ ██ The trial judge also erred in granting to the defendants the instruction that, if the jury believed from the evidence that the sums allowed by the hospital board to its own member, as per diem compensation for their services, were allowed in good faith and from honest motives, but in a mistaken exercise of the power of the board to allow such compensation, and if the jury believed from the evidence that board members believed that facts existed which justified such allowances, they should find for the defendants.

██ ██ The rule relating to the payment of compensation to public officers as stated in 67 C. J. S., p. 319, Officers, par. 83, is as follows: ''As respects compensation, an office is taken cum onere, and public officers

have no claim for official services rendered except where, and to the extent that, compensation is provided by law. The duties of a public officer may be exacted without specific compensation, and, when no compensation is provided, the rendition of services is deemed to be gratuitous.'' See also cases cited.

The statutes under which the members of the board of trustees in this case were appointed, and under which the hospital was being maintained and operated, made no provision for the payment of compensation to the members of the board of trustees; and no other statute, which has been brought to our attention, authorizes such payment. The allowances of per diem compensation to the members of the board were made without authority of law; and since no officer can claim to be acting as a judge in voting money to himself, the members of the board are not relieved from liability for the allowances made to themselves on the ground that they acted in good faith.

For the reasons stated above the judgment of the lower court is reversed and the cause remanded for further proceedings not inconsistent with what has been said above.

Reversed and remanded.

*McGehee, C. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.