Anthony Panozzo and Filomena Panozzo, Appellants,
v. City of Rockford, Appellees.

Gen. No. 9,559.

Opinion filed August 8, 1940.

B. Jay Knight, J. E. Goembel and Frederick H. Haye, all of Rockford, for appellants.

George T. Liddell, of Rockford, for certain appellee.

A. V. Essington, Corporation Counsel, and Carroll H. Nelson, City Attorney, of Rockford, for certain other appellees.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

On October 13, 1939, the city council of Rockford received three bids for the collection and disposal of all garbage, ashes, tin cans, rubbish and dead animals from both private and public property within the limits of the city. Before 1939, contracts of the city provided for the collection and removal of garbage during 8 months,

and other waste matter, during 12 months. Before asking for bids for the year 1940, the aldermen were considering the advisability of entering into a contract requiring the collection and disposal of garbage during 12 months. Consequently, the city council directed that each bid be manifold and state the price of the collection and disposal of garbage during 8 months, and during the entire year with other wastes during 8 months and one-year periods. The council also required the bids for such service for the year 1940 alone, and for the three-year period of 1940, 1941 and 1942. On the bidding known as Regular Bid No. 1, which specified the collection and disposal of all garbage and dead animals from April 1, 1940, to November 30, 1940, inclusive, and all ashes, tin cans, rubbish and dead animals from January 1, 1940, to December 31, 1940, inclusive, the plaintiff bid $32,862; one Nemo Grespan bid $33,362; and defendant George H. Smith, $37,500. The city council, having determined to abide by the method of collection and disposal of refuse, as expressed in Regular Bid No. 1, by vote of 9 for the bid of the plaintiff and 11 for the bid of Smith, accepted the bid of Smith. The plaintiff, Anthony Panozzo, and his mother, Filomena Panozzo, have brought this suit to restrain the city from entering into a contract with Smith as a result of the acceptance of his bid.

The original complaint was filed by Anthony Panozzo and named the City of Rockford, its mayor, clerk, treasurer and Smith as defendants. Count one alleged, generally, that the city council without lawful cause and reasonable basis, rejected the lowest bid which was Panozzo's and prayed for the writ of injunction to restrain the city from entering into a contract with Smith. Count two, with allegations similar to those in count one, petitioned for the writ of mandamus directing the city and its officers to enter into a contract with Panozzo under his bid. Motions were made by the defendants to strike the complaint because it is not within the province of the courts by mandatory injunction, or

mandamus, to control the exercise of discretion of a city council. Plaintiff thereupon asked and was granted leave to add Filomena Panozzo as a party plaintiff, and to file additional counts.

Additional count three, as amended, sets out that Filomena Panozzo is a resident and taxpayer of the City of Rockford; that Anthony Panozzo is ready, able and willing to perform the contract required by the city according to his bid; that Smith had the contract with the city for the collection and disposal of garbage and other refuse during the year 1939, during which time he engaged in business with various aldermen; that Robert Joyce, alderman from the second ward, acted as broker in writing workmen's compensation insurance and surety bond for Smith in 1939, and received a commission therefor; that Joyce requested Smith to employ Joe Carabelli and Archie Ferguson, residents of the second ward, and that Smith did employ them solely at the request of Joyce; that Smith has agreed with Joyce that if he should get the contract for 1940, he will allow Joyce to write such insurance and surety bond; that such insurance and surety bond for 1940, have been written and Joyce has received a commission as broker; that J. Francis Haste, alderman from third ward, is a salesman for Smith Oil & Refining Company; that prior to obtaining the contract for 1939, Smith asked Haste to place a gasoline pump at the place where Smith's trucks were kept; that Haste said he could not sell to Smith direct, but that Smith should buy his gasoline and oil at DeCarlo garage; that Smith did buy his gasoline and oil from DeCarlo; that prior to the vote on 1940 contract, Smith told Haste that if he got the contract for 1940, he would continue to purchase gasoline and oil from DeCarlo; that Harold J. Williams is alderman from seventh ward and in the junk business; that during 1939, Smith gave Williams part of the junk collected by Smith's trucks being operated to collect refuse of the city during 1939; that prior to letting of the

1939 contract, Williams requested Smith to employ Robert Priddle, resident of the seventh ward; that pursuant to such request, Smith employed Priddle; that Oscar Hallberg is alderman from the eighth ward, and that prior to the letting of the 1939 contract, Hallberg asked Smith to employ Robert Loveland, Hallberg's son-in-law, and Leroy Hallberg, alderman Hallberg's nephew; that pursuant to Hallberg's requests, Smith employed Loveland and Leroy Hallberg; that prior to letting the 1940 contract, Smith told Hallberg that if he received the 1940 contract he would continue to employ Loveland and Leroy Hallberg; that because of the facts stated, aldermen Joyce, Haste, Williams and Hallberg, who have made personal profits from transactions with Smith, were prejudiced in favor of Smith's bid for the contract of 1940; that Joyce, Haste, Williams and Hallberg voted in favor of giving the 1940 contract to Smith; that they voted for Smith because of personal profits, privileges and favors obtained from Smith in the execution of the 1939 contract and because of profits, privileges and favors if Smith should obtain the 1940 contract. Additional count three prays for a writ of mandamus directing the city and its officers to execute a contract with Panozzo under his bid. Additional count four contains the same charging allegations as count three and prays for a writ of injunction to restrain the city from entering into, or if entered into, from carrying out the contract with Smith under his bid. The complaint also prays for general relief.

The complaint also alleges that the vote upon the awarding of the contract to the bidders for the collection of the waste of the city for the year 1940, by the city council and by the aldermen of the city, was fraudulent, unfair and oppressive; that unless the prayer of the complaint is granted, the plaintiff and all other taxpayers of the City of Rockford will be forced to pay taxes of $4,638 unlawfully and without cause.

Aldermen Haste, Williams and Hallberg were given

leave and they intervened as parties defendant. Counts, one and two, on motion of the defendants, were stricken. An answer was filed to counts three and four by the city, its mayor, clerk and treasurer. Separate answers were filed by the intervening defendants and by Smith. The answers deny the charging parts of the complaint. The answers of the intervening defendants substantially allege that the defendant voted in favor of 1940 contract being given to Smith because of satisfactory service rendered by Smith during 1939; that defendants believed Panozzo, under his bid, could not carry out the terms of the contract requiring the contractor to pay his employees $125 per month; that defendants had estimated the cost of operation under specifications as being over $36,000; that they were of the opinion that in the event Panozzo could not carry out the contract, service would be interrupted and that there would be delay in securing performance of the contract or damages under the faithful performance bond; that defendants knew Smith had necessary equipment and employees to carry out the contract; that Panozzo on the night the bids were opened, stated that he had not made arrangements for disposal of the garbage; that the health committee of the city had made a thorough investigation of bidders and unanimously recommended acceptance of Smith's bid; that one bidder (Grespan), had not, in previous years, rendered satisfactory services under his contract to collect and remove the refuse of the city; that Smith's services for 1939 were approved by the city health commissioner.

The hearing was before the chancellor who rendered an order finding from the evidence produced before him, "that none of the individual aldermen had any unlawful interest in said contract as alleged in said complaint; and that there was no fraud or misconduct on the part of the said aldermen in the awarding thereof." The order denied the prayer for a writ of

mandamus and the prayer for a writ of injunction and dismissed the cause for want of equity.

The phrase, "lowest secure bid," found in sec. 319, ch. 24, Smith-Hurd Ann. Stats. [Jones Ill. Stats. Ann. 21.357], does not mean the lowest bidder financially only. It means more than that. It means that the bidder is, by experience and otherwise, capable of doing the work in a satisfactory manner. *People v. Omen,* 290 Ill. 59. It is not sufficient to overcome the presumption that the action of the city council in awarding the bid to Smith, was lawful and regular by an allegation that the bid was not awarded to the lowest bidder. (*Hallett v. City of Elgin,* 254 Ill. 343.) In the case of *McGovern v. City of Chicago,* 281 Ill. 264, 277, it is stated:

"In *Johnson v. Sanitary District,* 163 Ill. 285, the statute involved required that contracts which exceeded $500 should be let to the lowest responsible bidder. The lowest bid was $145,112 lower than the second bid. The sanitary district trustees rejected the lowest bid and awarded the contract to the next highest bidder, whereupon the lowest bidder instituted proceedings to compel the sanitary district to accept his bid. This court said on page 287 of the opinion: 'The mandatory injunction applied for to compel the letting of the contract to appellant is in the nature of a *mandamus* and is an attempt to control a discretion that is judicial in its nature. The duty of examining the proposals, determining the responsibility and awarding the contract is judicial in its nature and character, and the awarding the contract is a judicial act, which is not within the province of the courts to control by *mandamus* or mandatory injunction. [Citing numerous authorities.]' '' The chancellor did not err in denying the prayer of the third count for the writ of mandamus to compel the city council to award the contract to the plaintiff, Anthony Panozzo, under his bid.

Applicable to count four, it is stated in *McGovern v.*

*City of Chicago, supra:* "Nor can the courts, in the absence of fraud, restrain the trustees from entering into such contract as they may award to the bidder.— *Kelly v. City of Chicago,* 62 Ill. 279." There is no evidence in the record now before this court that there was actual fraud or fraudulent intent on the part of the aldermen who are charged in the complaint with improper conduct in awarding the contract to Smith. It is contended, however, by the plaintiffs that the court improperly rejected testimony offered by the plaintiffs tending, it is urged, to prove the allegation of fraud stated in the complaint. The question of the admissibility of the rejected evidence is deferred.

The chancellor filed a written statement giving his reasons for dismissing the suit, in which he held the complaint was without equity. From this statement it is clear therefrom, that the point was made by the plaintiffs that the contract with Smith under his bid is void, because the aldermen named in the complaint had an interest in such contract. The contention of the plaintiffs before the chancellor and this court is set forth in the following statement found in the case of *People ex rel. Pearsall v. Sperry,* 314 Ill. 205, 208:

"Contracts of a city in which the city officers join in making the same are prohibited by our statutes in all cases where such officers are directly or indirectly interested in the contracts, and any and all such contracts wherein the officers of the city are interested, either directly or indirectly, are declared to be null and void. (Hurd's Stat. 1921, sec. 78, p. 337, and sec. 3, p. 2192; *Crichfield v. Bermundez Paving Co.,* 174 Ill. 466.) A contract made in violation of an expressed statutory provision is inoperative and void and no recovery can be had thereon. (Citing cases.) . . . If we attach any significance to the words used by the statute, 'directly or indirectly interested in the contract,' we think the conclusion cannot be escaped that the officers of the city who are also employees of the contractor must be con-

sidered as indirectly interested in the contract, without regard to the fact that they derived no direct benefits from the contract itself. They would be more than human if they could make the same fair and impartial contract with the contractor as they could with another party with whom they had no relation, by way of employment or otherwise.''

It is our opinion that the evidence in the record before us does not show that the aldermen, named in the complaint, had such a direct interest in the contract to be made with Smith, within the meaning of the statute and the general law prohibiting contracts by a city council in which any of its members may be directly interested, as would justify this court in holding, as a matter of law, that the proposed contract with Smith would be void. Whether they had an indirect interest in the contract, which would annul the contract, is a question to be determined.

In the case of *Edward E. Gillen Co. v. City of Milwaukee*, 174 Wis. 362, 183 N. W. 679, it is stated: ''We would not hold that under all circumstances a contract between a municipality and a corporation having an employee who is also a public officer of the municipality would be invalid. The compensation of the employee might be so slight or his employment so transient that there would arise no conflict of interest.'' In *Tuscan v. Smith,* 130 Me. 36, 153 Atl. 289, 73 A. L. R. 1344, it is conceded that indebtedness of a person, with whom the city executes a lease, to a member of the town board of selectmen, does not necessarily create a pecuniary interest, directly or indirectly, of the selectman and vitiate his vote. It is plain from an analysis of the cases in the notes following the report of the *Tuscan* case in 73 A. L. R., that the question whether the relation of a debtor of a contracting party, to a public officer constitutes an interest within the statute or rule of common law against such officer being interested in a contract with the public, is to be determined

from the facts and circumstances appearing in evidence. In the case of *Wayman v. City of Cherokee,* 204 Iowa 675, 215 N. W. 655, it is held that the question whether the relationship as creditor of a councilman with a contractor to whom was let a contract to do cement work for the city presented a question of fact as to whether the councilman was directly or indirectly interested in the contract. Also, the general rule is, that relationship of a public officer to a contractor is not a disqualifying interest making it unlawful for an officer to be interested in a public contract without proof that the officer has a pecuniary interest in the contract. (*Thompson v. District Board of School Dist. No. 1 of Moorland Township,* 252 Mich. 629, 233 N. W. 439, 74 A. L. R. 790, and cases cited there in the annotation, p. 792, *et seq.*; *Tuscan v. Smith, supra.*)

We have concluded that the question in this case before us for review is, whether the finding of fact by the chancellor that none of the aldermen named in the complaint had such an indirect interest in the business and welfare of Smith as would naturally tend to affect their judgment in their determination to let the contract under the bids which were received, is contrary to the manifest weight of the evidence. (*People ex rel. Pearsall v. Sperry, supra,* p. 210.)

During 1938 and 1939, defendant Smith had contracts with the city for the collection and disposal of garbage, ashes, tin cans and dead animals. Defendants Williams and Hallberg, with aldermen Thorstenson, Ingrassia and Forbes composed the health committee of the city council of the city of Rockford. Dr. N. O. Gunderson was the health commissioner of the city and had been such for several years.

On October 13, 1939, the health committee with the health commissioner held a meeting to consider the bids, which the bidders attended, and were interviewed separately by the committee. The bid of Grespan was not seriously considered by the committee, because of

complaints made by citizen, that he had not satisfactorily performed his contract with the city for the collection of its refuse in 1937. Members of the committee knew, and there is testimony in the record, that Grespan had made some of his employees pay back to him $20 per month in violation of his contract of 1937, to pay his employees $100 per month. The evidence shows that Grespan assisted Panozzo in preparing his bid and wrote the amounts of that bid before Grespan prepared his bid. There was an understanding between Grespan and Panozzo that the successful bidder of them would give a job to the other as his employee under the contract to be let under the bid. There is evidence that some members of the health committee were suspicious that there was a "hook-up" between Panozzo and Grespan making their bids. This surmise was correct. Information called for in the Panozzo bids, relative to the equipment to be used in collecting the refuse of the city, was in the handwriting of Grespan, and not definite. Statements in his bid were uncertain as to where he would throw the collected garbage. The terms of the contract required payment of $125 per month to each employee of the contractor. It was the opinion of the members of the health committee that Panozzo's bid was too low under this requirement of the contract, according to information then in possession of the committee. The matter of equipment and disposal of the garbage was discussed by the committee with Panozzo. The health commissioner recommended that the bid of Smith be accepted. The committee unanimously adopted a report to be submitted to the city council that Smith's bid be accepted. Alderman Forbes, who signed the report of the health committee, but subsequently in the council meeting voted to accept the bid of Panozzo, told Panozzo that the reason his bid was not recommended by the health committee was because Panozzo had made a poor showing before the committee; and that he should see the aldermen.

It is clear from the evidence that Panozzo endeavored to prove to the aldermen that his bid was not too low for him to pay the wages of $125 per month; that he could secure the necessary equipment; that he also assured the members of the health committee and other alderman that he would hire the same men as were employed by Smith to collect and dispose of the wastes of the city. It also appears that the aldermen were undecided whether the garbage should be collected during 12 or 8 months of the year. When the report of the health committee was submitted to the city council on October 16, by request the report was laid over for further investigation until October 23. At the meeting of October 23, the report upon a vote was laid over until the meeting of October 30, when the vote was taken and Smith's bid was accepted. During the time between the meetings of the council on October 16, and October 30, the health committee decided again that it was for the best interests of the city that the garbage be collected and disposed of during 8 months of the year. The committee also considered the amount of Panozzo's bid, and the question of wages under the contract. At the council meeting of October 30, it is clear from the record, that the aldermen were divided on the question whether Panozzo could give satisfactory service under his bid and in open meeting of the city council discussed various phases of the bids and the right of the council to accept a bid which was not the lowest.

The above facts are stated to show that the city council did not, so far as any evidence appears in the record, act arbitrarily, or secretly in letting the contract to Smith. The only contention that remains is that the aldermen named in the complaint were indirectly interested in awarding the contract to Smith.

There is no evidence that alderman Williams received junk from Smith. There is no proof that alderman Joyce, an insurance broker by occupation, solicited in-

surance from Smith prior to the awarding to Smith of the refuse collection contract of 1939, nor that he had any understanding with Smith about the insurance for that contract. (*Henschen v. Board of School Inspectors of School Dist. No. 86, Will County,* 267 Ill. App. 296.) The fact that relatives of alderman Hallberg were employed by Smith when the city council voted to let the contract to Smith did not, without further proof, disqualify Hallberg from voting to let the contract to Smith. (74 A. L. R., *supra.*) The evidence is to the effect that Smith made application to John H. Camlin Company for workmen's compensation insurance and surety bond for the 1940 contract; there is no proof in the record that Joyce had any pecuniary interest in the premiums which Smith would pay for his insurance and surety bond for the 1940 contract.

Smith testified that for several years before 1938, he had bought his oil and gasoline from DeCarlo, who was a friend of his. The fact, as shown by evidence, is that Haste is a salesman for the Smith Oil & Refining Company from whom DeCarlo purchased oil and gasoline. Alderman Haste testified that he received no credits nor commissions from Smith's purchases of oil and gasoline from DeCarlo and there is no evidence to the contrary. We would not be warranted under these facts alone, to draw the inference, and imputation that Haste had such an interest in the welfare of the business of Smith, or that of DeCarlo, as conflicted with his duty to award the contract now in question according to his judgment for the best interests of the City of Rockford.

Alderman Williams was called as an adverse witness by the plaintiffs. He testified that in 1938, he voted against the acceptance of Smith's bid for the removal of city refuse, but voted for him to receive the 1940 contract now in question. That between those times, Robert Priddle, a voter residing in Williams' ward, asked him to introduce him to Smith; that he intro-

duced Priddle to Smith at the city hall and asked him to give Priddle consideration as his employee if he had a place open. That he did not consider the employment of Priddle as a favor to him. Smith employed Priddle in 1939. Smith also employed two men residing in alderman Joyce's ward at the request of Joyce. Smith employed the son-in-law and the nephew of alderman Hallberg at the request of Hallberg. Joyce did not testify. Each of the other two aldermen testified that he did not receive a pecuniary consideration because of the employment of the men mentioned. There is no evidence in the record that they did. When plaintiff Panozzo was questioned by the aldermen what equipment he would use, and the men he would employ if awarded the contract for 1940, under his bid, he stated that he would use the same type of equipment and the same men as Smith was using and employing under the 1939 contract.

Statutes prohibiting public officers from having an interest in contracts executed in their official capacity are declaratory of the common law. 46 C. J. 1038; *McCarthy v. City of Bloomington ex rel. McIntosh,* 127 Ill. App. 215; Dillon on Municipal Corporation, sec. 531. We find no cases which were decided under any other rule than that the interest in a contract which disqualifies a public officer from executing such a contract in his official capacity, must be pecuniary. As is stated in *Meyer v. City of San Diego,* 121 Cal. 102, 53 Pac. 434, such interest must be certain, definable, pecuniary or proprietory. The interest must be financial. *Mumma v. Town of Brewster,* 174 Wash. 112, 24 P. (2d) 438, 440. The cases herein referred to which involved the question of relationship of the public officer with the person with whom he entered into a contract in his official capacity, or the question of the relationship of debtor to the officer, turn on the facts whether the officer is financially interested in the contract.

It is contended by the plaintiffs that the court erred

in sustaining objections, of the intervening defendants, to testimony by Grespan that Smith told Grespan that he could depend on certain aldermen because he employed the nephew of alderman Hallberg and that he was going to give all his insurance to alderman Joyce. The testimony was held admissible as against Smith, but not competent against the other aldermen. The ruling of the court was correct under the rule prohibiting the reception of hearsay evidence.

The judgment of the trial court is affirmed.

*Affirmed.*