530 So.2d 5 (1988)
Jimmy SMITH, Daniel Jennings, Calvin C. Williams and Bennie Knox
v.
Reverend James DORSEY, John E. Walls, Jr., Carl R. Brandon, Gussie P. Wilson, Harriet Aikerson, Roosevelt Yarbrough, State of Mississippi, ex rel. Edwin Lloyd Pittman, Attorney General and the Mississippi Ethics Commission.
No. 58288.
Supreme Court of Mississippi.
March 16, 1988.
As Modified on Denial of Rehearing August 3, 1988.
Kennie E. Middleton, Fayette, for appellants.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Suzanne M. Smith, Sp. Asst. Atty. Gen., Jackson, for appellees.
EN BANC.

ON PETITION FOR REHEARING
GRIFFIN, Justice, for the Court:
The opinion released March 16, 1988 is modified. The following is now the official opinion of the Court.
The Reverend James Dorsey, John E. Walls, Jr., Carl L. Brandon, Gussie P. Wilson, Harriet Aikerson, Individually and as Taxpayers of Claiborne County, Mississippi, and Roosevelt Yarbrough, Individually and as a Taxpayer of Claiborne County, Mississippi, and as a member of the Board of the Claiborne County School District, brought an action seeking declaratory and injunctive relief in the Claiborne County Chancery Court against Jimmy Smith, Daniel Jennings, Calvin C. Williams and Bennie Knox, remaining members of the Claiborne County School Board, for their conduct allegedly in violation of Section 109 of the Mississippi Constitution of 1890. The State through Edwin Lloyd Pittman, Attorney General, and the Ethics Commission joined the action by way of invitation from these plaintiffs. The final decree of the lower court found the defendants in violation of Section 109, and defendants appeal here.
In this appeal this Court is asked to construe Section 109 as applied to contracts of teachers whose spouses are school board members. Stated differently, may a local *6 school board contract with the spouses of its members?
In Frazier v. State by and through Pittman, 504 So.2d 675 (Miss. 1987), we held that as between a legislator and spouse as a public school teacher, no such conflict of interest exists. We held that Section 109 was never intended to prohibit any individual from serving in the legislature and voting on general public school laws and appropriations therefor simply because his or her spouse is employed as a public school teacher in this state.
Here we have a different factual situation, requiring another answer, therefore, we affirm the order of the chancery court as to defendants Jimmy Smith, Daniel Jennings, Calvin C. Williams, and Bennie Knox, finding that each of the defendants has been and is in violation of Section 109; declaring null and void all contracts between defendants' spouses and the Claiborne County School District; and enjoining the payment of any further salaries or payments of money to these spouses while the defendants are members of the Claiborne County Board of Education and for a period of one year after defendants shall leave said official capacities.
We reverse as to the chancellor's order requiring restitution from the defendants for compensation received in violation of Section 109.

FACTS
Proceedings in the lower court were held on October 9, 1986. Testimony at trial and stipulated exhibits include documents issued to defendants by the Secretary of State certifying them as Claiborne County School Board members; contracts for employment for their spouses  Jo Anne Collins Smith, Mary Jennings, Ernestine Williams and Catherine Knox  as teachers in the Claiborne County School District, at the time defendants served as board members; the teachers' payroll records from 1980  1986; and minutes of the Claiborne County School Board from 1980  1986.
On direct examination Dr. John Noble, the Claiborne County Superintendent of Education, stated that, following his recommendations of applicants for teaching positions within the district, the Claiborne County School Board had the authority to reach contracts of employment with these prospective teachers. The salaries for these teachers come from two separate sources, local funds and the State Minimum Program Fund. The contracts for employment contain within them the salary to be paid to the individual, as approved by the Board.
On October 10, 1986, the chancellor entered an order finding all defendants to be in violation of Section 109. He further adjudicated the defendants' spouses' contracts to be null and void, and that each defendant had an indirect interest in these contracts as he had been a Trustee of the Claiborne County Board of Education when said Board approved one or more contracts for the employment of the defendants' spouses.
Finally, the chancellor ordered claims of restitution be made against the spouses of the defendants because of the Section 109 violations. The Court found that these violations as to all defendants and their spouses had existed for several years up to and including the present date.
This appeal followed.

LAW
Article 4, Section 109 of the Mississippi Constitution of 1890 provides:
No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
In Frazier, supra, at 693, we said that this section prohibits any officer from:
(a) having any direct or indirect interest in any contract
(b) with the state or any political subdivision

*7 (c) executed during his term of office or one year thereafter, and
(d) authorized by any law, or order of any board of which he was a member.
We noted that while there is no difficulty in ascertaining (b) and (c), and while (a) and (d) have not always been so clear-cut, the answer "usually [being] simple, ... it is (a) and (d) where the gray areas are encountered." Id.
The chancellor found that each defendant had an indirect interest in his spouse's contract as prohibited by Section 109. We would agree.
In Frazier, supra, at 698, we declined to go so far as to hold that the rational purpose and intent of the 1890 constitution prohibited James Nunnally, appellant therein, from running for the legislature and serving as a member of that governmental branch, which voted on several public school laws at the time when his wife, Betty Jo Nunnally, was employed as a public school teacher in this state.
Whatever might be said of the logic supporting the contention that Sec. 109 was violated because (1) Mr. Nunnally was in the Legislature, (2) which passed a law authorizing his wife's public school employment contract (3) in which he manifestly had some interest, it simply defies practical wisdom to carry this section to such an extreme. As Justice Brandeis once observed, "the logic of words should yield to the logic of realities." DiSanto v. Pennsylvania, 273 U.S. 34, 43, 47 S.Ct. 267 [270], 71 L.Ed. 524, 529 (1927).
Id.
However, without hesitation we find that logic dictates some manifest interest by appellants herein in the public school employment contracts of their wives. Appellants are directly responsible for the hiring and firing of their spouses. Additionally, the record indicates that these school board members share fully in the process behind which the salaries are awarded to public school teachers in their district. This is not to say that we question the integrity or fairness of these board members in any way; we simply recognize that each has an indirect interest in his wife's contract which violates the constitutional provision.
In Frazier, this Court said the following:
We hold that where a portion of the salaries derived by public school teachers under their teaching contracts comes from discretionary local tax levies, a teacher cannot make a valid contract with a school district while he is on the board of the governing authority which makes such tax levies, or within one year after his term on the governing board expires. Such a contract violates Sec. 109.
It therefore follows that insofar as Miss. Code Ann. § 25-4-105(3)(h) attempts to make an exception and authorize such a contract, it is at cross purposes with Sec. 109 and unconstitutional.
As was aptly stated in Commonwealth v. Withers, 266 Ky. 29, 98 S.W.2d 24, 25 (1936):
It is a salutary doctrine that he who is intrusted with the business of others cannot be allowed to make such business as object of profit to himself. This is based upon principles of reason, of morality, and of public policy. These are principles of the common law and of equity which have been supplemented and made more emphatic by the foregoing and other statutory enactments. 504 So.2d at 700.
And while this interpretation of Sec. 109 addresses the situation in which a school board member votes his own salary out of discretionary local tax levies, no distinction can be made by his voting that of his wife  the interest therein is one and the same.
Next, we address the question of restitution ordered by the lower court and brought up on appeal.
In the trial below plaintiffs and appellees herein neither plead nor raised the question of any bad faith committed by appellants for their role in the employment of their spouses. Nor did the chancellor make any finding of such.
In our review of the record, we can see no allegation by these Claiborne County *8 taxpayers that they did not receive value for services performed by the teachers, whose time of employment ranged from two (2) to thirty-three (33) years. Further, in at least one instance the record shows that a spouse of one board member had been teaching long before his election to that body.
We have no doubt that such circumstances involving husband and wife teams in which one teaches and the other serves as a member of the school board are commonplace across this state, with no thought to any wrong-doing by the parties involved.
In Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1943), this Court declined to order restitution to the parties therein because
... a public official who, in the performance of his duty, acted in good faith reliance upon a statute before it had been declared unconstitutional by a Court should not be held civilly liable for the conduct authorized by such statute. The chancellor found no bad faith on the part of any of the defendants in their misplaced reliance on the condemned sections, and we cannot say he was manifestly wrong in such finding. On cross-appeal the chancery court judgment should be affirmed. Frazier, supra, at 704.
Although factually at odds with Golden (there is no statute upon which appellants herein in good faith relied upon as there was in Golden), we follow its rationale as the result reached in that case promotes the only equitable proposition available to the parties in the case at bar.
In Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454 (Miss. 1983), this Court, quoting the earlier case of Wilborn v. Balfour, held that:
A court of equity is a court of conscience, but not a forum of vengeance. It will make restitution but not reprisals. It will fill full the measure of compensation, but will not overflow it with vindictive damages. 218 Miss. 791 at 805, 67 So.2d 857 at 863 (1953).
We believe an award of restitution here amounts to nothing more than the granting of punitive damages, and absent a showing of bad faith, or even proof of loss, is improperly given.
In Griffith's Mississippi Chancery Practice, we find the following:
It is more than a trite phrase that the court of equity is a court of conscience; and it is immaterial what rights a party could assert in a court of law,  a court of equity will limit him to those rights of which he could conscientiously avail himself. It has been tersely expressed that nothing but conscience, good faith, and reasonable diligence can call forth the activities of a court of equity, and that when these requisites are wanting, the court is passive and does nothing. It makes no exertion to extend relief to those who, being able to take care of their interests, have neglected so to do, and thereupon find themselves in predicaments which ordinary care would have avoided. That "equity aids the vigilant, not those who slumber," is one of its great maxims. Thus it is that an applicant may be barred out of equity by laches, that is to say, but such neglect and delay in asserting his rights as would make it inequitable to others to permit him at such a late day to assert them.
Griffith, Mississippi Chancery Practice (2d.Ed.) § 32 (1925). Cf. Suggs v. Town of Caledonia, 470 So.2d 1055 (Miss. 1985); Covington County v. Page, 456 So.2d 739 (Miss. 1984); State v. Stockett, 249 So.2d 388 (Miss. 1971).
The record reflects that the conduct of the defendants here had been the general practice in Claiborne County for many years, and we would concede that a similar case could be made in many other counties of the state. The claim for restitution, however, should be denied on other grounds. There is no way the parties can be put back in their original position before the teaching contracts were entered. For restitution to be equitable, there would have to be some way of restoring to the teachers the value of the services they have rendered to the schools. Obviously, this cannot be done. To require restitution *9 under the facts of this case would place these school teachers in a position where they would have served as public school teachers without pay, and in several instances for a number of years. The equitable remedy of restitution should not be enforced in such an inequitable way.
We hold that the above premise, coupled with the fact that there is no allegation or finding of bad faith on the part of the appellants, would make it grossly inequitable to require restitution on the peculiar facts presented here. This complies with our rationale announced in Frazier, supra, wherein we reasserted the rule announced in Golden v. Thompson, supra, wherein a public official was not liable where he acted in good faith in reliance upon an unconstitutional statute. We can find very little difference in the reliance upon an unconstitutional statute and prolonged acquiescence of the State, particularly when there is no allegation that the school district did not get what it bargained for, a good school teacher.
We, therefore, uphold the chancellor's order finding appellants herein have been and are in violation of Sec. 109; declaring the contracts of appellants's spouses to be null and void; and enjoining any further payment of salaries, etc. to said spouses while appellants remain as members of the Board of the Claiborne County School District and for a period of one year after the defendants shall leave their official capacities, however, as in Alexander v. State by and through Allain, 441 So.2d 1329 (Miss. 1983), we do not invalidate contracts expiring in 1988. We reverse the chancellor's order of restitution.
There is one final point. The chancellor's decision was rendered October 10, 1986. The appeal was taken without supersedeas. The salaries of the teachers whose husbands are parties to this action have been withheld pursuant to the October 10, 1986 order. Since we are affirming that portion of the order which declares the contracts illegal, no funds should be paid to the teachers after October 10, 1986. The monies withheld should be returned to the general funds of the school district.
PETITION FOR REHEARING DENIED; OPINION MODIFIED; AFFIRMED IN PART, REVERSED AND RENDERED IN PART.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P. JJ., and ANDERSON, J., concur.
PRATHER, J., specially concurring by written opinion.
ROBERTSON, J., concurring in part and dissenting in part by written opinion.
SULLIVAN, J., dissenting by written opinion.
ZUCCARO, J., not participating.
PRATHER, Justice, specially concurring in part and dissenting in part:

I.
The landmark case involving interpretation of Article 4, Section 109 of the Mississippi Constitution of 1890 and certain portions of Miss. Code Ann. § 25-4-105 (Supp. 1987) was Frazier v. State by and through Pittman, 504 So.2d 675 (Miss. 1987). Frazier, supra, held that there was a constitutional prohibition against inter alia, legislators who voted for appropriation bills that funded their respective individual teaching contracts with the state or subdivision thereof, and Frazier additionally held a teacher, whose salary came from discretionary local tax levies, could not validly contract with a school while sitting on the board that assessed the tax levy. However, the Frazier opinion held that a teacher sitting on a city board which assessed a tax levy which was statutorily mandated was not precluded from entering into a contract with the school board.
The intent of § 109 was examined and stated to be for the purpose of protecting the government. Ibid., p. 694. Further, the Court analysis may be summarized by concluding that the primary intent of constitution framers was to prevent public officers' judgment from being influenced for personal benefit or private gain.
*10 Bearing in mind the intent of § 109, the Frazier Court concluded that:
Our interpretation should not be "too literal," Dunn v. Love, 172 Miss. 342, 355, 155 So. 331, 333 (1934); City of Jackson v. Deposit Guaranty Bank & Trust Co., 160 Miss. 752, 133 So. 195 (1931); and we have recognized that no constitutional prevision [sic] requires to be done that which is "thoroughly impracticable." Gulf Refining Co. v. Stone, 197 Miss. 713, 741, 21 So.2d 19, 21 (1945). We have likewise stated that our Constitution should be interpreted:
... In the light of developments which have appeared at the time of interpretation, and may therefore include things and conditions which not only did not exist but were not contemplated when it was drafted, so long as the new developments are in their nature within the scope of the purposes and powers for the furtherance of which the constitution was established.

Stepp v. State, 202 Miss. 725, 729, 32 So.2d 447, 447, suggestion of error overruled, 202 Miss. 725, 33 So.2d 307 (1947).
The Frazier opinion applied an interpretation that was practical and applied common sense to conditions not contemplated by the constitutional framers in 1890. A distinction was drawn between the situation in which a legislator appropriates funds for his own contract with the state and the situation in which a legislator appropriates funds for a large class of individuals of which his wife was treated equally with other members of the class. In Frazier, supra, Legislator Nunnally did not set his wife's salary; it was set by an independent school board. The opinion contained the following reasoning:
To inform the people of this state that they could not elect an individual to the legislature whose spouse is employed by the state as a member of a large class would be an unchannelled proscription that would strike out at public officials at random and risk depriving our people of the choice of selecting what may well be among our most able and deserving public servants. It is also a matter of common knowledge that it is not easy to get qualified citizens to offer their talents for public office. It is vital to democratic government that membership in the Legislative body be composed of members from as wide and diverse sections of the public as possible. No social, political or economic section should be precluded by law from running for the Legislature without good reason. Any evil sought to be avoided by § 109 would become attenuated by prohibiting a prospective legislator from serving the public. Such, a prohibition, when balanced against the potential harm to our people, goes beyond any possible intent or purpose of this section. We cannot envision the authors of § 109, or the people of this State in 1984 and 1986, ever intending that employment of a wife in the capacity of Mrs. Nunnally would prevent the spouse from running for the Legislature, and if elected, serving in that branch of government.
Ibid, p. 698.
The opinion concluded that the Constitution never intended to prohibit a legislator voting on general appropriation bills because his spouse was paid equally with other members of a large class. Notwithstanding this analysis, the court reserved ruling on the question of a husband being on a school board which employed his wife. Thus, the situation involving Mrs. Nunnally was carved out as an exception to the Frazier rule. This Court is now called upon to answer this circumstance.

II.
With this background in mind, and with the consideration of the purpose of the constitutional prohibition in mind, there are two interests that a school board member has in his spouse's contract. Obviously, the pecuniary benefit that comes into the household is one; however, the securing of a teaching contract initially is yet another interest.

A.
Insofar as the securing of a teaching contract is concerned, the procedure is statutory *11 and is mandated by Miss. Code Ann. § 37-9-17 (Supp. 1987), as follows:
On or before April 1 of each year, the principal of each school shall recommend to the superintendent of the school district the certificated employees to be employed for the school involved except those certificated employees who have been previously employed and who have a contract valid for the ensuing scholastic year. If such recommendations meet with the approval of the superintendent, he shall recommend the employment of such certificated employees to the school board, and, unless good reason to the contrary exists, the board shall elect the certificated employees so recommended. If, for any reason, the school board shall decline to elect any certificated employee so recommended, additional recommendations for the places to be filled shall be made by the principal to the superintendent and then by the superintendent to the school board as provided above.
Pursuant to Miss. Code Ann. § 37-9-17, a school board does not have the discretion to employ school teachers, including spouses. The school board only has the discretion not to employ those teachers. This is consistent with long standing educational policy and regulatory practice in this state that school boards should not be involved in day-to-day personnel activities, but rather should be policy-making bodies. A school board cannot employ a school teacher, unless that teacher has been recommended for employment by both the school building principal and the school superintendent.
The school board member can initiate no hiring of a teacher, and thus there is no hiring discretion, but only discretion in nonhiring. Efforts by a school board member to secure a hiring contract would violate accreditation standards as well. The statute mandates that the Board accept the superintendent's recommendation unless good reason exists to the contrary.
Thus, insofar as the hiring discretion of a school board member is concerned, there are statutory procedures to prevent the exercise of discretion in teacher hiring by the school board members resulting in their personal gain.

B.
Next, insofar as the pecuniary benefits that a board member may receive from his spouse's salary, again statutory procedures are in place to mandate the minimum amount of salary paid. In Miss. Code Ann. § 37-9-33, the school board is mandated to pay the minimum amount in compliance with Chapter 19, Minimum Program of Education, Miss. Code Ann. § 37-19-1 et seq. The funds for the payment of the minimum education program come from the State Treasurer and the State Fiscal Management Board through legislative appropriation and not through county or city tax levy. Miss. Code Ann. § 37-19-45. No discretion is exercised by the school board in this determination, but the State Board of Education sets the scale of minimum salaries. Miss. Code Ann. § 37-19-7.
I would conclude that, where no discretion is exercised by a school board member in setting his spouse's salary, there is no constitutional violation. The purpose and intent of § 109 has been met and the public official's judgment has not been tainted for personal gain. Frazier, supra.

III.
Our consideration, however, cannot end here for other conditions are included in the factual situation before us.
Prior to July 1, 1986, a local school board includes the mandated minimum teacher salary item in its budget and submits the budget to the city or county for funding. Within its discretion, the school board could have requested the local taxing authority to supplement minimum teachers' salaries from additional local tax monies. Then the board of supervisors or the municipal board could have provided local taxes if in its judgment such was feasible. Miss. Code Ann. § 37-9-33. No discretionary judgment was exercised by the school board unless a supplemental amount was sought and then it was only given with the approval of the county or city governing authority.
*12 However, with passage of the Uniform School Laws Act of 1986 (effective July 1, 1986), local school districts now have "fiscal independence." This simply means that a local school district (subject to certain percentage increase limitations) has complete authority with respect to mandating tax levies. (This authority is limited to seven percent of the prior year's tax avails. Miss. Code Ann. § 37-57-105, -107. No longer does a county board of supervisors nor a municipality have any discretion over the school district's requested budget levy, provided that the budget increase is properly set within the legislatively determined limitations.)
A local school district has wide discretion with regard to its local ad valorem levy. It is permitted (in fact required) to supplement teacher salaries and to provide transportation facilities, materials, utilities, etc. It is also required to employ certain certified professionals required for accreditation purposes (state law requirement), but for which no funds are paid by the state.
A portion of the local ad valorem tax levy (also known as the "local supplement" under the minimum program statutes) is attributable to individual local supplements paid to teachers. These payments are made pursuant to a salary schedule for the individual teachers who may or may not be covered under the minimum education program. This salary supplement varies quite significantly from county to county and city to city, depending upon a large variety of factors. The two most significant factors, of course, are the ability to pay and the willingness to impose tax levies upon the community.
This brings our consideration to the instant case. The contracts in question in this appeal span principally, fiscal years before and subsequent to the Uniform School Law Act of 1986. The Claiborne County School District was mandated to pay salaries as set by the minimum education program of the State Department of Education. Additionally supplemental salaries were sought from and approved by the board of supervisors.
Does the school board's exercise of judgment in seeking supplemental salaries violate the constitutional prohibition when the intervening judgment of the board of supervisors is a precautionary factor for the contract years prior to the Uniform School Laws Act of 1986? For the contract years subsequent to July 1, 1986, does the school board's exercise of judgment in seeking supplemental salaries violate § 109 when the request is within legislative determined limitations?
To answer this situation, I would apply the language of Frazier, supra, on a common sense practical interpretation and adopt a remote, insubstantial standard for deciding whether a school board member is interested in his spouse's contract when discretionary judgments are exercised.
Other jurisdictions' case law indicates that no court has developed a concise, uniform definition of a prohibited direct or indirect interest which can be applied uniformly across the spectrum of conflicts questions. Instead, courts determine if an interest is prohibited by reviewing the facts of each case in light of the prohibition's purpose. If the facts indicate that the official's alleged "interest" is such that a reasonable person would believe that it could influence the official's judgment, the interest is prohibited.
Where an official's interest is "direct," such as when he sells products or services to the body on which he sits, the determination of whether his interest may affect his judgment may seem obvious. However, not every direct interest may influence an official's judgment. For example, where a board member is the only available supplier within the district's boundaries and supplies products or services to the board at cost, the chance that his interest will affect his judgment is small. Likewise, where strict statutory procedures and guidelines have drained all discretionary judgment from the board, the potential that a board member's interest could affect his judgment is negligible.
Where an alleged interest is "indirect", the determination of whether an official may be influenced is more difficult. *13 Courts scrutinize the facts of each case to determine if the indirect interest can reasonably be expected to influence the official's judgment. As stated in Githens v. Butler County, 350 Mo. 295, 165 S.W.2d 650, 652 (1942):
[i]t is impossible to lay down any general rule defining the nature of the interest ... which comes within the operations of these principles... . When the interest is not direct, there is more reason for considering each case on its special facts.
In Township Committee of Hazlet v. Morales, 119 N.J. Super. 29, 289 A.2d 563 (1972), the court stated that:
[w]hether a particular interest is sufficient to disqualify is factual, depending upon the circumstances of the particular case. The question is always whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty.
Accord, Panozzo v. City of Rockford, 306 Ill. App. 443, 28 N.E.2d 748 (1940); Copple v. City of Lincoln, 202 Neb. 152, 274 N.W.2d 520 (1979).
Where an official's interest is so remote, speculative, insubstantial or inconsequential that it cannot reasonably be expected to influence his judgment, courts generally find that the interest is not prohibited. As stated in Githens, supra, 165 S.W.2d at 652, "An indirect interest may be so remote as to not avoid a bargain between an official and the public body he represents... ." An interest is remote or insubstantial where any potential benefit which the official may receive is far removed, or unlikely to occur, or dependent upon the decision of an independent third party so that the possibility of the benefit cannot reasonably be believed to influence his judgment. Yetman v. Naumann, 16 Ariz. App. 314, 492 P.2d 1252 (1972); Morales, supra, 289 A.2d 563; McCloud v. City of Codiz, 548 S.W.2d 158 (Ky. 1977); Panozzo, supra, 28 N.E.2d 748; Copple, supra, 274 N.W.2d 520.
Other courts have held that where an official's interest is so small that the interest could not reasonably be expected to influence his judgment, the interest is not prohibited. The interest may be inconsequential either where the official's ownership interest in the contracting party is negligible or where his interest is responsible for only a negligible portion of his income. For example, in Mississippi Power & Light v. Town of Coldwater, 168 F. Supp. 463, 477 (N.D.Miss. 1958), the court was asked to invalidate the town's franchise agreement with Mississippi Power & Light ("MP & L") because a town alderman owned MP & L stock when he voted to approve the agreement. The court upheld the franchise agreement, reasoning that the alderman owned only 50 of 69,000 non-voting preferred MP & L shares. Although Gillen Co. v. City of Milwaukee, 174 Wis. 362, 183 N.W. 679, 682 (1921) held that the public official's interest was not slight, the court noted that in some cases, a public official employed by a contractor may have "compensation ... so slight or ... employment so transient that there would arise no conflict of interest."
A remote/insubstantial standard would comport with the court's traditional approach to constitutional interpretation. City of Jackson v. Deposit Guaranty Bank & Trust Co., 160 Miss. 752, 133 So. 195, 198 (1931); Dunn v. Love, 172 Miss. 342, 155 So. 331 (1934); W. Horace Williams Co. v. Federal Credit Co., 198 Miss. 111, 21 So.2d 582, 583 (1945). Frazier, supra.
Furthermore, the standard is consistent with Mississippi precedents. Adoption of the proposed standard has the benefit of fulfilling the purpose of § 109 while allowing its application sufficient flexibility to adapt to developments which may not have been contemplated when the provision was drafted.
A literal reading of § 109's language as an absolute prohibition of any interest whatsoever would have a disruptive effect on government at all levels. Such an interpretation would mean mass resignations of people who are public spirited and possess skills and experience relied upon by their governmental bodies, thus depriving the state of sorely needed talent.
*14 Applying the Frazier rationale and the remote/insubstantial standards together, the result is a three-prong test:
1. Does the board member have absolute discretion in the employment or other contract interests?
2. Is the pecuniary benefit bestowed the result of inclusion in the general class?
3. Is the benefit insignificant or remote (even if included in a class)?
Regarding the first prong, the statutorily mandated hiring procedure for teachers shows that the school board has no absolute hiring discretion or other contract interest.
Analysis of the last prongs cause us to return again to the Frazier case, and to the exception carved out in Mrs. Nunnally's situation. There the Court held that she was a member of a class and her husband acted properly as a reasonable and prudent person to vote on an appropriation where Mrs. Nunnally received equally with other members of a large class.
In the case presently before the Court, it appears that spouses of school board members would be entitled to the same protection under § 109 as members of the class to which Mrs. Nunnally belonged. However, in the present case the amount of the local supplement paid to these teachers far exceeded and transcended the normal standard for local supplement in any other school district in this state. There is prima facie evidence of abuse of authority because of the gross sums of money paid to the class and because a clear majority of the board members benefited from this action. This record suggests that an abuse of judgment and discretion has taken place to such an extent to remove this case from the "class" analysis by the Nunnally situation of the Frazier case.
Therefore, I conclude with the majority that a violation of the § 109 constitutional provision is present. The distinction which I find present here was that the exercise of the discretionary decision to provide a supplement to the local teachers pecuniarily affected the majority of school board members individually and influenced their judgment.
However, if the supplemental amount sought by the school board was of an insubstantial amount when divided equally among a large number of similarly situated individual teachers, the possibility of a prohibited interest in the contract is decreased. Our sister state of Alabama has so held by concluding that where the class of potential beneficiaries is large, the [members of the authorizing body] are presumed to be acting in the public's best interest. Opinion of the Justices No. 317, 474 So.2d 700 (Ala. 1985).
Therefore, I concur in the result reached by the majority and would affirm the trial court on this issue.

IV.
The majority opinion next addresses the trial court's finding that the contracts of the Claiborne County School Board with the teacher/spouse of the board members were null and void and that, therefore, restitution should be ordered. The majority held that the trial court should be affirmed in holding the school employment contracts null and void, but reversed the trial court's order of restitution.
With regard to both of these issues, it is my view that neither of these issues should have been addressed without the inclusion of these contracting spouses/teachers as parties in this lawsuit. The record does not reveal that the contracting teachers were parties. Therefore, I respectfully disagree with the majority's declaring their contracts null and void without their joinder in this lawsuit as a person needed for a just adjudication. M.R.C.P. 19.
However, I concur with the result of the majority's reversal of the trial court's order of restitution. My concurrence is based upon the absence of a person in the lawsuit necessary for a just adjudication of their rights. M.R.C.P. 19.
ROBERTSON, Justice, concurring in part, dissenting in part:
The Court today holds that the "one year" prohibition of Section 109 begins to *15 run on the last day of the school board member's service in office. Under this reading nothing would turn on whether the board member leaves office upon expiration of his term or by some other means, such as resignation. As much as I am in sympathy with this view and the practical reasoning behind it, I do not understand how we can say the law allows it.
Section 109, as the Court otherwise reads it, says no school board member's spouse may teach under a contract within the board member's district
during the term for which he [the board member] shall have been chosen, or within one year after the expiration of such term.
My understanding of the English language suggests that but one meaning may be found in these words: that the "one year" prohibition begins to run on the last day of the term of office which the school board member is serving and not from the date on which the school board member resigns. In short, the school board member cannot start the running of the one year period early by resigning before the end of his or her term as a school board member. This may be harsh. It may be impracticable. It is also the law.
In all other respects, I concur in the opinion of the Court.
SULLIVAN, Justice, dissenting:
It is my belief that the chancellor was absolutely correct in granting restitution to the State of Mississippi and therefore the majority opinion is in error. I dissent further because in my view the majority opinion ignores heretofore well established principles of law, misapplies simple doctrines of equity, and erects an insurmountable barrier to those who would require that our elected officials not engage in constitutionally proscribed self-dealing.
I respectfully suggest that the majority's extension of Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1943), to this case is an ill-considered step in the wrong direction. The issue before us today was decided long ago. Those who violate the specific prohibitions of Section 109 are liable. Golding v. Salter, 234 Miss. 567, 107 So.2d 348 (1958); Miller v. Tucker, 142 Miss. 146, 105 So. 774 (1925); State v. Levee Commissioners, 96 Miss. 677, 51 So. 211 (1910); Noxubee County Hardware Co. v. City of Macon, 90 Miss. 636, 43 So. 304 (1907). There is a narrow exception to this rule  those who violate our constitution while relying in good faith upon a statute which purports to specifically authorize the unconstitutional conduct may assert the statute as a defense to an award of damages. Frazier v. State, by and through Pittman, 504 So.2d 675 (Miss. 1987); Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1943). In Frazier we extended the holding of Golden somewhat in that an award of restitution is not, strictly speaking, an award of "damages." If Frazier represents a slight retreat, today's decision represents a total rout. Furthermore the majority by pretending that the restitution here is punitive damages now requires that litigants who succeed in showing the violation of the constitution must also assume the added burden of showing that the constitution was violated in bad faith. If mental gymnastics were on the agenda in the olympic games, the majority would certainly come home with the gold.
Today's case presents no legitimate opportunity for an extension of the limited good faith defense announced in Golden. As the majority recognizes, today's case presents no statute upon which the appellants can be said to have relied in good faith. Indeed since Section 109 very explicitly forbids the self-dealing which is present in this case one may only wonder upon what the appellants did rely. The majority would answer this question by responding that the appellants relied on their established practice of violating Section 109 and therefore need not make restitution for that violation. By today's decision we have proclaimed that the Mississippi Constitution is the paramount law of this State but it may be disobeyed or disregarded with impunity if, by custom and usage, an individual or even a community can *16 show that for a period of years they have ignored or disobeyed the constitution.
The majority recognizes that neither Golden nor Frazier provide any basis whatsoever for the extension of this rule, yet they would erect a new barrier to the enforcement of our constitution because it "promotes the only equitable proposition available to the parties in the case at bar." Majority op. at 8. The luxury of creating general constitutional doctrines to do equity in a particular case is one we frequently deny ourselves.
In casting about for some legal basis for this decision the majority opinion lights upon the doctrine of laches and then determines that it bars the relief granted by the chancellor. Such a conclusion is possible if one does not mind ignoring our scope of review, Rules of Civil Procedure, and many aspects of the doctrine of laches itself.
Laches is an affirmative defense and as such it must be pleaded and proved by the asserting party. See Rule 8(c), Rules of Civil Procedure; Sumrall v. Doggett, 511 So.2d 908, 910 (Miss. 1987). We have even refused to consider the issue of laches where it was properly pleaded but was not litigated. Allgood v. Allgood, 473 So.2d 416, 422-23 (Miss. 1985).
Laches is a matter for the sound discretion of the trial judge because the doctrine is largely a question of fact. Morgan v. Morgan, 431 So.2d 1119, 1120 (Miss. 1983); Payne v. Campbell, 250 Miss. 227, 164 So.2d 780 (1964). Laches is also an equitable defense and for that reason it may not be raised by one who does not have clean hands. Shelton v. Shelton, 477 So.2d 1357 (Miss. 1985); Pearson v. Fortner, 386 So.2d 205 (Miss. 1980); Cain v. Thomas, 373 So.2d 812 (Miss. 1979).
In today's case laches was neither pleaded nor proven yet this Court plucks it from the air as though it were a rabbit in a hat and proceeds to reverse the chancery court.
The majority next reaches into the contract law bag and holds that one must show bad faith in order to recover payments made pursuant to a "contract" even though that contract is void and illegal. Much is made of the fact that no bad faith was alleged and no deficient performance was shown.
The bad faith element announced today by the majority represents a radical departure from our previous holdings. In Miller v. Tucker, 142 Miss. 146, 105 So. 774 (1925), we held that a supervisor whose contract with the county violated Section 109 was liable on his official bond, as were all board members who participated in that allowance. Miller, 142 Miss. at 159, 105 So. at 784.
In Noxubee v. Macon, 90 Miss. 636, 43 So. 304 (1907), we were presented with a dispute which had arisen between two aldermen, Holberg and Horton, who were also merchants competing for the town's business. We addressed the application of Section 109 to this dispute and stated:
There are some things which are so well settled that it is surprising that we should have to restate them. It is utterly immaterial, where the great paramount public policy of the state is involved in the effective administration of the constitutional provision (sec. 109), whether Holberg sold goods cheaper than Horton, or whether either or both were attempting to get a monopoly of the town's trade, or whether either or both acted in good faith in whatever sales they did make, or whether either or both sold the goods at a reasonable and fair price whilst they were aldermen of the said town, or whether both were guilty of fraud and in pari delicto. ... These questions are all utterly immaterial and wholly out of place, when the effort is here to have enforced a wise and salutary policy of protection for all the people by the constitution in sec. 109. Private interests sink utterly out of sight. The public interest is supreme in controversies like this. These principles are so well settled that a short restatement of them is surely all that can be called for.

The state cares nothing about Holberg or Horton, or their concerns. The state cares everything that the salutary principle of public policy embodied in this sec. 109 shall be faithfully and *17 fearlessly carried out, so as to prevent graft of every possible sort, and secure the honest and clean administration of municipal affairs. (Emphasis added).
Noxubee, 90 Miss. at 640-41, 43 So. at 304-05. Today's opinion takes us down a path that we specifically rejected nearly a century ago.
More recently, in Golding v. Salter, 234 Miss. 567, 107 So.2d 348 (1958), we addressed and rejected the "good faith" defense which the majority opinion adopts today. In Golding, the State Auditor sued members of the Neshoba County Hospital Board of Trustees seeking to recover payments made to the hospital trustees in violation of Section 109. The hospital had purchased eggs and beef from two of the board members. At trial, the defendants were allowed to show that the goods were sold at prevailing market prices and the payments were made in good faith. Relying on Noxubee v. Macon, State v. Levee Commissioners, and Miller v. Tucker, this Court rejected the "good faith" argument which today's majority finds persuasive and stated:

Payments for supplies sold to the hospital by members of the board of trustees themselves, in violation of Section 109 of the State Constitution and in violation of the above mentioned criminal statute, are so clearly and distinctly payments which the board of trustees in this case could not lawfully make as to bar the members of the board from claiming justification or immunity from liability therefor on the ground that they were acting in a quasi judicial capacity, and that the payments were made in good faith and honest error.

The trial judge also erred in granting to the defendants the instruction that, if the jury believed from the evidence that the sums allowed by the hospital board to its own member, as per diem compensation for their services, were allowed in good faith and from honest motives, but in a mistaken exercise of the power of the board to allow such compensation, and if the jury believed from the evidence that board members believed that facts existed which justified such allowances, they should find for the defendants. (Emphasis added).
Golding, 234 Miss. at 595, 107 So.2d at 359-60.[1]
In the case at hand as in Golding, the payments made in violation of Section 109 are so "clearly and distinctly" unlawful that the appellants' claim of good faith should be barred. Golding, 234 Miss. at 595, 107 So.2d at 360. As Golding v. Salter, clearly illustrates, performance of a void contract which violates Section 109 does not entitle one to keep the illegally gotten sums. If the majority wishes to overrule Golding v. Salter, supra; Miller v. Tucker, supra; State v. Levee Commissioners, supra; and Noxubee v. Macon, supra; and make more difficult the enforcement of Section 109, they should do so explicitly.
Today's opinion equates the restitution granted by the chancellor with punitive damages. Suffice it to say that the two are very different and rarely confused. If the sum awarded by the chancellor can be said to be "punitive" in any sense it is only because the appellants made it so. That the amount is large serves only to illustrate the magnitude of the Section 109 violation. Again, the taxpayers are entitled to recover these illegally gotten salaries. Golding v. Salter, 234 Miss. 567, 595, 107 So.2d 348, 360 (1958).
Our disposition of this case is especially troubling, and I fear, revealing. Instead of remanding this case for a determination of laches (about which not a word was breathed at trial) and bad faith (heretofore irrelevant) we simply render a judgment on these completely undeveloped factual issues.[2] At any rate the message is clear. Spend public money in violation of Section *18 109 at will. If one violates Section 109 long enough, laches sets in; if many violate Section 109, the violation itself (like a statute) will afford a defense. If you are caught, keep the money.
The majority then abandons its original ill considered laches discussion and plants its feet firmly on the somewhat tenuous proposition that if one takes money in violation of the constitution for a number of years one should be allowed to keep it for it would be inequitable to award a restitution. So much for the old equitable maxim that equity will not assist a wrongdoer.
Building on the "inequitable" premise and coupling that with the new bad faith requirement, the majority announces that it is unable to distinguish a difference between good faith reliance on an unconstitutional statute and a long acquiesced in agreement to carry out an unconstitutional scheme. This is particularly appalling in view of the fact that both the teachers and the board members, the two groups who acquiesced in the unconstitutional scheme, are the wrongdoers in this case. It would also appear to me that if we add the burden of showing bad faith on the taxpayers we should at least require the defendants to prove what we so glibly assume, that they did, in fact, provide good teachers. Not one shred of evidence is in the record that the teachers involved in this case were good, bad or indifferent.
I take this opportunity to point out that I cannot, and suggest that Mississippi should not, accept the rationale that we lack sufficient people of public spirit, talent and skill to fill the vacancies that would occur in our governmental bodies if we required our people to follow the constitution that our people adopted. That is the argument of rampant good ole boyism; it is based in negativism, defeatism, and surrender. We should categorically reject this argument with its whining undertone that "... after all, this is just Mississippi and we can't do any better." We can and we must.
This Court does not have the luxury of consoling itself with the assumption that the taxpayers got what they bargained for  good teachers. There is an older and much more profound bargain whose benefits those taxpayers are denied by today's decision. A contract was once made for constitutional government in Mississippi; although its benefits may be less tangible than the money involved in this case, they are no less real. Although I have great respect for the sanctity of contract, my respect for the constitution is greater by far. By our very oaths we are sworn to uphold the Constitution of the State of Mississippi and the laws thereof and we cannot lightly put that aside in order to apply principles of equity to uphold an illegal and unconstitutional contract. Even equity must follow the law. I therefore, with great respect to the majority, disagree that the chancellor made reversible error in granting restitution; I would affirm his decision.
Furthermore, I concur with all but the last sentence of the Concurring and Dissenting Opinion of Justice Robertson filed separately.
NOTES
[1] It is interesting to note that the court in Golding v. Salter, declined the opportunity to broaden the very limited "good faith" defense adapted fifteen years earlier in Golden v. Thompson.
[2] The majority would require an "allegation or finding of bad faith." Majority op. at pages 8, 9. The careful litigator will note that this makes bad faith somewhat different from laches which apparently requires neither an allegation nor a finding.